J. T. HOBBY & SON, INC., A NORTH CAROLINA CORPORATION (SUCCESSOR CORPORATION TO HOBCO BUILDING COMPANY); ROBERT MONTGOMERY PAYNTER AND WIFE, SHIRLEY L. PAYNTER; AND, THOMAS C. BOGLE AND WIFE, SARA M. BOGLE v. FAMILY HOMES OF WAKE COUNTY, INC., A NORTH CAROLINA CORPORATION

No. 72

(Filed 27 January 1981)

**1. Deeds § 20.3— residential restrictive covenant — family care home not prohibited**

A restrictive covenant limiting the use of subdivision lots to residential purposes was not violated by the use of a lot for a "family care home" in which resident managers would serve as surrogate parents to four mentally retarded adults, since the property in question was not employed in a manner which was significantly different from that of neighboring houses except for the fact that most of those who lived within it were mentally retarded, and the fact that defendant was compensated for the service it rendered did not render its activities at the home commercial in nature.

**2. Deeds § 20.3— single family dwelling — restrictive covenant — family care home not prohibited**

A provision in a restrictive covenant as to the character of the structure which may be located upon a lot does not by itself constitute a restriction of the premises to a particular use; therefore, a restrictive covenant limiting the use of subdivision lots to detached single family dwellings was not violated by the use of a lot for a "family care home" in which resident managers would serve as surrogate parents to four mentally retarded adults, where nothing in the record indicated that defendant had altered the structure used as a family care home in any manner so that its appearance or its character was anything other than that of a dwelling which would be utilized by anything other than a typical American suburban family.

Justice MEYER did not participate in the consideration or decision of this case.

Justice HUSKINS dissenting.

. Chief Justice BRANCH joins in the dissenting opinion.

ON discretionary review of the decision of the North Carolina Court of Appeals reported at 46 N.C. App. 741, 266 S.E.2d 32 (1980), affirming the judgment of *Smith, (Donald L.), S.J.*, entered at the 28 May 1979 Regular Civil Session of WAKE Superior Court granting summary judgment in favor of plaintiffs.

The individual plaintiffs each own separate residential lots in the Scarsdale subdivision in the City of Raleigh, North Carolina. Plaintiffs Paynter took title to their property on 9 December 1968, and plaintiffs Bogle took title to their property on 10 September 1970. The corporate plaintiff, J. T. Hobby & Son, Inc., is the successor corporation to Hobco Building Company which developed the subdivision. The corporate defendant, Family Homes of Wake County, Inc., also owns a residential lot in the development.

In the course of developing the subdivision, the corporate plaintiff caused certain restrictive and protective covenants to be recorded in the office of the Wake County Register of Deeds. These covenants applied to all of the residential lots in the Scarsdale subdivision. The present case involves the construction of one of these covenants and its application to the property owned by defendant.

· The specific protective covenant which is at issue in the instant case provides that

No lot shall be used except for residential purposes, but nothing herein shall be construed to mean that a lot may

> not be converted to a street regardless of the type of use
> made of such street. No building shall be erected, altered,
> placed, or permitted to remain on any building unit other
> than one detached single-family dwelling not to exceed
> 2½ stories in height, a private garage for not more than
> three cars and outbuildings incidental to residential
> use . . . .

None of the other covenants which are contained in the pertinent deeds are at issue in the present litigation.

On 22 May 1977, the Raleigh City Council, invoking its powers under the city charter to regulate the density of population, as well as the location and use of buildings, amended its zoning ordinances so as to authorize the placement within the city limits of residential care facilities for persons afflicted with physical disabilities, developmental disabilities, or mental retardation. *See* Raleigh, N.C., Code § 24-2(38)(c) (1959).[1] The amendment went on to define a family care home as being

> . . . a dwelling licensed by the North Carolina Depart-
> ment of Human Resources, Division of Facility Services,
> as a family care home for two (2) or more, but not more
> than five (5) unrelated persons, excluding supervisory
> personnel, who because of a physical disability, develop-
> mental disability, or mental retardation need a substi-
> tute home: provided that persons with any of the follow-
> ing categories shall not be eligible for admission to a
> family care home:
>
> a. Persons addicted to or recuperating from the effects
> of or addiction to drugs or alcohol;
> b. Persons adjusting to non-prison life, including but
> not limited to pre-release, work-release, probationary
> programs and juvenile detention centers; and

---

[1] Since the present litigation arose, the Raleigh City Code has been recodified. This particular provision has not been carried over into the new Code. Hereinafter, all citations to Raleigh City Ordinances will be references to the 1980 City Code. Citations to the 1959 Code will be footnoted.

c. Persons requiring professional health care.[2]

Raleigh, N.C., Code § 10-2002 (1980).[3]

The amended ordinance permitted the establishment of family care homes in all residential districts of the city provided that the size of the lot upon which the facility was to be established complied with all of the applicable subdivision requirements, as well as with all of the pertinent zoning regulations. Raleigh, N.C., Code § 10-2073(23)(a) (1980).[4] The City Council further provided that in order to avoid the creation of a *de facto* social service district, as well as to avoid impacting a residential block, no more than one such facility was to be permitted within a three-quarter mile radius. Raleigh, N.C., Code § 10-2073(23)(c) (1980).[5]

The day after the ordinance was enacted, defendant went before the Raleigh Board of Adjustment seeking a special use permit so that a family care home could be established. At a subsequent meeting of the Board, on 13 June 1977, a hearing was held on defendant's application. Ms. Mary Jane Sanderson represented defendant at that hearing. According to Ms. Sanderson, defendant sought a special use permit so as to enable it to operate a family care home for five mentally retarded adults at 300 Millbrook Road in North Raleigh. It is this parcel of property which is at the heart of the present litigation. Defendant envisioned that an adult couple would live at the house with the handicapped residents and that at least one of the adults would be present whenever any of the residents were on the premises. The Millbrook Road location was deemed appropriate by defendant for the reason that it was located near a

---

[2] The North Carolina Department of Human Resources defines a family care home as being ". . . a small residence which provides sheltered care for two to five adults who, because of age or disability, require some personal services along with room and board to assure their safety and comfort." North Carolina Department of Human Resources, Minimum and Desired Standards for Group Homes for Developmentally Disabled Adults 9 (1978).

[3] Raleigh, N.C. Code § 24-2(48) (1959).

[4] Raleigh, N.C., Code § 24-49(C)(23)(a) (1959). The ordinance regulated the size of the dwelling by providing that any such facility could not have less than 1,400 square feet of heated floor area. In addition, it mandated that 1½ parking spaces be provided for each sleeping room, or in the alternative, 1 parking space for each sleeping room of 70 square feet or less.

[5] Raleigh, N.C., Code § 24-49(C)(23)(a) (1959).

bus stop as well as a shopping center. These factors were considered important because they would enable the residents to move about on their own without requiring the houseparents to provide transportation.

The Chief Zoning Inspector stated that the property in question had a lot size of approximately 12,325 square feet which was in excess of the 10,890 square foot area which was required for housing in the particular zoning district. The dwelling itself had an area of approximately 2,700 square feet. The inspector made the further observation that the distance between the location of the proposed family care home and the nearest similar facility was approximately two miles, clearly in excess of the distance requirement which was imposed by the ordinance. The only respect in which the proposed facility did not comply with the pertinent zoning ordinance was the lack of off-street parking. While there was room in the driveway to park three cars, there were no parking places as such then existing at the site. However, the inspector concluded that there was sufficient space at the house to enable defendant to provide the six required parking spaces.

Thereupon, having heard from its staff, as well as from defendant, the Board received a petition from counsel representing residents of the subdivision. Signed by 101 individuals who lived in the neighborhood, the petition expressed the residents' opposition to the placement of the family care facility in the development. Residents of the subdivision, in their own behalf, as well as by counsel, contended that the development had been established for the purpose of creating a residential area of a single family nature. Particular individuals elaborated upon the character of the development, contending that the placement of a family care home on Millbrook Road would create problems of traffic congestion, as well as security.[6] Other residents voiced the concern that the placement of the family care home in the development would lead to a decrease in property values of the surrounding tracts.[7]

---

[6] At the hearing, counsel for defendant observed that during the operation of three other group homes in Wake County by defendant, no incidents had occurred involving the residents of these homes, nor had any complaints concerning their behavior been lodged with the appropriate authorities.

[7] At the hearing, Mr. Jim Kyriakis, a mental retardation specialist with the

Basing its decision upon findings of fact drawn from the evidence presented at the hearing, the Board of Adjustment concluded that the proposal of defendant for the operation of a family care home at the Millbrook Road house met the criteria established by the Raleigh City Council in the amended zoning ordinance. Having so concluded, the Board unanimously voted to grant the special use permit which had been sought by defendant.

Plaintiffs filed suit against defendant shortly thereafter, seeking a permanent injunction to restrain defendant from using the Millbrook Road property "as a 'family care home,' to provide institutional care for mentally retarded persons, or any other use not consistent with and specifically permitted by the protective covenants of Scarsdale Subdivision . . . ." The matter came on for hearing on plaintiffs' motion for summary judgment based upon stipulations of fact entered into by the parties which were consistent with the evidence presented to the Board of Adjustment. Defendant responded to the motion by offering the affidavit of its president, John N. Fountain. According to the affidavit, the purpose of the group home was to provide for the mentally retarded residents who lived therein the atmosphere of a single family home. In order to afford the residents this opportunity, the home operated as a single economic unit, with the resident managers serving as surrogate parents who were assisted with cooking, cleaning, shopping, and other household chores by the residents. The affidavit further stated that no structural changes had been made in the dwelling.

Concluding that there was no genuine issue as to any material fact, and that plaintiffs were entitled to summary judgement, Judge Smith entered summary judgment in their favor. He ordered that a permanent injunction be issued against defendant to restrain it from the further operation of the family care home. However, the effect of the injunction was stayed during the pendency of any appeal.

The Court of Appeals, in an opinion written by Judge Hill, concurred in by Judges Martin (Robert M.) and Webb, affirmed,

Wake County Mental Health Center, stated that the National Association of Realtors had made a study concerning the impact that the placement of group homes for the retarded had upon property values within the neighborhood. According to the study, property values have increased and not gone down in such areas.

concluding that the operation of the family care home was an institutional use of the property, not a residential use. Defendant's petition for discretionary review pursuant to G.S. § 7A-31 was allowed by this court on 15 July 1980.

*Seay, Rouse, Johnson, Harvey & Bolton, by James L. Seay and Ronald H. Garber, for plaintiff-appellees.*

*Theodore A. Nodell, Jr., and Smith, Moore, Smith, Schell & Hunter, by McNeill Smith, for defendant-appellant.*

*Blanchard, Tucker, Twiggs, Denson & Earls, by Charles F. Blanchard and Irvin B. Tucker, Jr., for the Association for Retarded Citizens of North Carolina, Inc., amicus curiae.*

*Carolina Legal Assistance for Mental Health, by Deborah Greenblatt, for the Governor's Advocacy Council for Persons with Disabilities, amicus curiae.*

*Merritt & Gaylor, by Cecil P. Merritt, for The Mental Health Association in North Carolina, Inc., amicus curiae.*

*Van Camp, Gill & Crumpler, P.A., by Douglas R. Gill, for Sandhills Mental Health Center, Inc., amicus curiae.*

BRITT, Justice.

In deciding this appeal, we need to address only one issue: Did the Court of Appeals err in concluding that the restrictive covenant was violated by the "institutional" use of the property by defendant? We answer in the affirmative.

Our resolution of this issue turns upon our construction of two phrases contained in the restrictive covenant upon which plaintiffs rely: "residential purpose" and "single-family dwelling."

We begin our analysis of this case with a fundamental premise of the law of real property. While the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, *e.g., Long v. Branham,* 271 N.C. 264, 156 S.E.2d 235 (1967), *see generally* J. Webster, Real Estate Law in North Carolina § 346 (1971), such covenants are not favor by the law, *e.g., Cummings v. Dosam, Inc.,* 273 N.C. 28, 159 S.E.2d 513 (1968), and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. *Stegall v. Housing Authority of the City of Charlotte,* 278 N.C. 95, 178 S.E.2d 824 (1971); *Long v.*

*Branham, supra.* The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent. *Davis v. Robinson,* 189 N.C. 589, 127 S.E. 697 (1925); *see generally* 7 J. Grimes, Thompson on Real Property § 3160 (1962). Even so, we pause to recognize that clearly and narrowly drawn restrictive covenants may be employed in such a way that the legitimate objectives of a development scheme may be achieved. Provided that a restrictive covenant does not offend articulated considerations of public policy or concepts of substantive law, such provisions are legitimate tools which may be utilized by developers and other interested parties to guide the subsequent usage of property.

It is a matter of common understanding that the pertinent terms which guide a legal relationship between parties are not always clearly defined, if they are defined at all. Sound judicial construction of restrictive covenants demands that if the intentions of the parties are to be followed, each part of the covenant must be given effect according to the natural meaning of the words, provided that the meanings of the relevant terms have not been modified by the parties to the undertaking. *Callaham v. Arenson,* 239 N.C. 619, 80 S.E.2d 619 (1954); *Westinghouse Electric Supply Co. v. Burgess,* 223 N.C. 97, 25 S.E.2d 390 (1943).

Having laid the proper foundation for our consideration of the question presented, we now turn our attention to an appropriate analysis of the terms upon which the controversy is founded.

[1]   Defendant contends first that the Court of Appeals erred in concluding that the Millbrook Road property is being utilized in an institutional rather than a residential manner. The essence of defendant's argument is that the residential usage requirement is satisfied if the property is used for the habitation of human beings and for those activities such as eating, sleeping, and engaging in recreation which are normally incident thereto. Plaintiffs respond by arguing that a family care home is analogous to a boarding house, such usage having been widely held to violate restrictive covenants requiring that real property be utilized for residential purposes only. *See generally* Annot., 14 A.L.R.2d 1376 (1950). While the analogy which plaintiffs seek to draw between a family care home and a boarding house is intriguing, we find its forcefulness to be unpersuasive. It is our opinion that while a family care home

does not comport in all respects with the traditional understanding of the scope of the term "residential purposes," its essential purpose, when coupled with the manner in which defendant seeks to achieve its stated goals, clearly brings it within the parameters of residential usage as contemplated by the framers of the restrictive covenant which is at issue in this case.

The home at 300 Millbrook Road presently serves as a place of abode for four mentally retarded adults, as well as a married couple who serve as resident managers of the facility. The avowed function of the resident managers is to serve as surrogate parents to the handicapped individuals who live in the house. In this regard, at least one of the surrogate parents is present whenever any of the retarded persons is on the premises. All of the disabled individuals are employed in sheltered workshops in the Raleigh area between the hours of 7:45 a.m. and 5:00 p.m. on weekdays. The home is operated in such a manner that the residents are able to live in an atmosphere much like that found in the homes of traditionally structured American families. In an effort to achieve that goal, all of the retarded residents assist the married couple in the performance of the various duties which are required to maintain the normal operation of the home: cooking, cleaning, shopping, and other similar household chores. In other words, in terms of the day-to-day activities of its inhabitants, the Millbrook Road property is not employed in a manner which is significantly different from that of neighboring houses except for the fact that most of those who dwell within it are mentally retarded.

We are aware that while defendant, Family Homes of Wake County, Inc., is a non-profit corporation which is under contract to and controlled by the Wake County Mental Health Authority, its services at the family care home are not rendered gratuitously. The home operates as a single economic unit whose operating funds are provided by government grants and receipts from the residents themselves. The resident managers are compensated for their services. That the continued operation of the facility on Millbrook Road requires an on-going economic exchange is an insubstantial consideration.

Our resolution of the question of the nature of the usage of the property at issue does not turn upon the economic basis upon which the property is supported. That basis does not detract from the primary objective behind the operation of the facility and the

essence of that operation: Providing a non-institutional setting for normal human habitation and the activities incident thereto for mentally handicapped adults. It is this purpose and method of operation which serves to distinguish defendant's usage of the Mill-brook Road property from that normally incident to a boarding house.

While we deem it unnecessary to reach the question of whether the individuals living at the home constitute a family, we are compelled to observe that the surrogate parents and the adults subject to their supervision function as an integrated unit rather than independent persons who share only the place where they sleep and take their meals as would boarders in a boarding house. *See Crowley v. Knapp.* 94 Wis.2d 421, 288 N.W.2d 815 (1980); *but see Seaton v. Clifford,* 24 Cal. App.3d 46, 100 Cal. Rptr. 779 (1972).

That defendant is compensated for the services it renders does not render its activities at the home commercial in nature. While it is obvious that the home would not exist if it were not for monetary support being provided from some source, that support clearly is not the objective behind the operation of this facility. That defendant is paid for its efforts does not detract from the essential character of its program of non-institutional living for the retarded. Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of defendant's efforts. In no way can it be argued that a significant motivation behind the opening of the group home by defendant was its expectation of monetary benefits.

The Court of Appeals observed that in its application for review filed with the Raleigh Board of Adjustment, defendant indicated that its proposed use of the property was of an institutional character rather than choosing to characterize the undertaking as a residential usage. In this regard, we note that it is appropriate to regard the substance, not the form, of the transaction as controlling and not be bound by the labels which have been appended to the episode by some individuals. *See Thompson v. Soles,* 299 N.C. 484, 263 S.E.2d 599 (1980). The uncontroverted facts of the present case belie the institutional characterization on the application before the Board of Adjustment. The manifest purpose of the operation of the home is to provide its residents with a family-like setting unlike that found in traditional institutions for the care of the mentally handicapped. Furthermore, no educational or vocational training

of any kind is provided at the home for the residents. Nor is any medical or nursing care provided at the house. In virtually all respects, other than the mental capacity of those who live on the premises, the house operates much like a typical suburban household.

We conclude that the Millbrook Road property is being used by defendant for residential purposes.

**[2]**　The second part of the restrictive covenant which is at issue in this case provides that

> No building shall be erected, altered, placed or permitted to remain on any building unit other than one detached single-family dwelling not to exceed 2½ stories in height, a private garage for not more than three cars and outbuildings incidental to residential use.

Defendant argues that the restrictive covenant, in effect, places two distinct requirements upon the owners of property in the Scarsdale subdivision: a requirement as to usage of the property and a requirement as to the nature of the structure which may be placed on a parcel in the development. Plaintiffs respond by arguing that a covenant which prescribes the type of building which may be erected necessarily limits the use that may be made of it after it is erected. *See, e.g., Schwarzschild v. Welborne,* 186 Va. 1052, 45 S.E. 2d 152 (1947). We disagree with the position taken by plaintiffs for several reasons.

First, plaintiffs' position is inconsistent with one of the fundamental premises of the law as it relates to restrictive covenants: Such provisions are not favored by the law and they will be construed to the end that all ambiguities will be resolved in favor of the free alienation of land. While it is possible that a restriction as to the type of structure would, in some instances, limit the character of the type of usage to which the building is employed, we conclude that such is not necessarily the case. Indeed, it is not uncommon for buildings that had once served as residences to be acquired by businesses and other concerns for renovation and subsequent utilization in new and varied ways.

Second, each part of a contract which contains a restrictive covenant must be interpreted in such a manner that each portion of the covenant is given effect if that can be done by fair and reason-

able intendment. *See Ingle v. Stubbins*, 240 N.C. 382, 82 S.E.2d 388 (1954); *Callahan v. Arenson, supra*. By its express terms, the restrictive covenant provides a restriction on the character of the usage of the property by requiring that no lot may be used "except for residential purposes." An interpretation of the phrases which relate to a single-family dwelling as being a usage restriction would be to render them mere surplusage because nothing they contain adds anything to the concept of "residential purposes" in a clear and distinct way. All of the components of the particular clause may be interpreted according to their ordinary and accepted meanings as relating to structural matters. By delineating the number of stories which the building may contain, and the number of cars which its garage may accommodate, as well as nature of the outbuildings which may be erected on the lot, it would seem that the framers of the covenant were seeking to impose a *structural* requirement upon owners of the tract. Nothing in the record indicates that defendant has altered the structure which had been erected on the Millbrook Road site in any manner so that its appearance or its character is anything other than that of a dwelling which would be utilized by anything other than a typical American suburban family.

We hold, therefore that a provision in a restrictive covenant as to the character of the structure which may be located upon a lot does not by itself constitute a restriction of the premises to a particular use. *Compare Scott v. Board of Missions*, 252 N.C. 443, 114 S.E. 2d 74 (1960). While a restrictive covenant may be so clearly and unambiguously drafted that it regulates the utilization of property through a structural limitation, such was not done in the present case.

Because of our disposition of the foregoing two issues, we decline to discuss the remaining issues discussed by the Court of Appeals, deeming them unnecessary to our decision. Nothing we have said herein ought to be interpreted to mean that restrictive covenants cannot be drafted so as to regulate the character of the structures erected in a neighborhood or their utilization. We emphasize that despite the salutary policy considerations behind the family homes concept, *see generally* H. Turnbull, The Law and the Mentally Handicapped in North Carolina 16-1 to 16-18 (2d ed. 1979), our decision today rests not upon newly fashioned rules and procedures but upon the established principles of the common law which we have found appropriate to apply to a contemporary con-

cept of care for the handicapped.

The decision of the Court of Appeals is

Reversed.

Justice MEYER did not participate in the consideration or decison of this case.

Justice HUSKINS dissenting.

I respectfully dissent from the majority opinion. The restrictive covenant in question, when properly construed, prohibits nonresidential use of property in the Scarsdale subdivision in the City of Raleigh, North Carolina. The house at 300 Millbrook Road is presently used for institutional purposes — not residential purposes.

To operate the facility, (1) a caretaker staff and house manager are required, (2) the operation is strictly licensed and regulated by government agencies, (3) the operation is financed by a grant from the State plus welfare, social security and employment payments of the occupants, and (4) defendant on occasion has itself characterized the use of 300 Millbrook Road as institutional. In applying for a permit to operate the facility, defendant was required to categorize the property as "Residential, Commercial, Office, Institutional, Day Care, or Industrial." Defendant categorized the property as "Institutional."

In my view, the majority goes beyond the parameters of sound legal reasoning to help these unfortunate wards of the State and society. If this had been a college fraternity, a benevolent social order providing for destitute members or a refuge for former criminals trying to re-enter society, the majority would likely say such use is nonresidential. Yet the reasoning applied today would allow such uses of Scarsdale property. The Court should not, by interpretation, defeat the plain and obvious purpose of restrictive covenants. *Long v. Branham*, 271 N.C. 264, 156 S.E.2d 235 (1967).

The keeping of boarders has been held to be a nonresidential use unless keeping a boarder is incidental to the use of a premises by a family. *See generally* 14 A.L.R.2d 1376, 1406 (1950). If boarding people is a nonresidential use, certainly this use, wherein four retarded persons are housed for a fee provided from funds of the occupants as well as grants from the State, is also nonresidential.

Finally, I note the public policy of this State as expressed in

G.S. 168-9:

> Each handicapped citizen shall have the same right as
> any other citizen to live and reside in residential com-
> munities, homes, and group homes, and no person or
> group of persons, including governmental bodies or polit-
> ical subdivisions of the State, shall be permitted, or have
> the authority, to prevent any handicapped citizen, on the
> basis of his or her handicap, from living and residing in
> residential communities, homes, and group homes on the
> same basis and conditions as any other citizen.

This is a policy which I wholeheartedly endorse. However, in the
present case, the residents of Scarsdale subdivision must use their
property for residential purposes only because the covenant in each
deed so requires. Any handicapped person is free to acquire a home
in the Scarsdale subdivision and reside there under the same rules
and restrictions as other residents. Public policy requires no more.
Neither should this Court.

Chief Justice BRANCH joins in this dissent.