BERNARD R. SMITH AND WIFE, MARY ELLEN SMITH, MIKE HODGINS AND WIFE, HILARY HODGINS, LEWIS ANTON AND WIFE, MARY E. ANTON, ALTON L. SIBLEY AND WIFE, JUANITA H. SIBLEY, JOSEPH H. JONES AND WIFE, MARY A. JONES, ARCHIE WOOD AND WIFE, BETTY`WOOD, CECIL BENNETT, JR. AND WIFE, JO ANN JONES BENNETT, EDNA W. GATHERCOLE, WILLIAM B. MERCER AND WIFE, PATRICIA M. MERCER, BRENDA J. NORMAN AND HUSBAND, HENRY D. NORMAN v. ASSOCIATION FOR RETARDED CITIZENS FOR HOUSING DEVELOPMENT SERVICES, INC., RUFUS L. EDMISTEN, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA, AND WESTMINSTER COMPANY

No. 843SC1075

(Filed 2 July 1985)

Deeds § 20.3— subdivision restrictive covenants—group care facility—single family residential dwelling

A group care facility conformed with the requirements of single family use and design and construction and thus constituted a single family residential dwelling within the meaning of subdivision restrictive covenants.

APPEAL by plaintiffs from *Winberry, Charles B., Judge.* Judgment entered 25 July 1984 in CRAVEN County Superior Court. Heard in the Court of Appeals 9 May 1985.

Plaintiffs, homeowners in the North Hills Subdivision in Craven County, North Carolina, instituted this civil action to temporarily and permanently enjoin the Association for Retarded Citizens for Housing Development Services, Inc. (hereinafter ARCHDS) from erecting a dwelling in the North Hills Subdivision. ARCHDS is a non-profit corporation which secures federal funding for the construction of family care homes. Plaintiffs alleged that the ARCHDS structure violated the restrictive covenants applicable to the subdivision. The Attorney General of North Carolina petitioned, and was granted the right, to intervene as a party defendant. The following facts are pertinent to this appeal.

The North Hills Subdivision is subject to restrictive covenants which provide, in pertinent part, that:

(1) LAND USE AND BUILDING TYPE: No structure shall be erected, altered, placed or permitted to remain on any lot other than for use as a single family residential dwelling . . .

(2) DWELLING SIZE: Any dwelling erected upon any lot shall contain, if a one story dwelling, not less than 1,200 square feet of ground floor heated area . . . and if more than a one story dwelling no less than 900 square feet of ground floor heated area . . .

(3) DWELLING QUALITY: All dwelling and outbuildings erected upon any lot shall be constructed of material of good grade, quality, and appearance, and all construction shall be performed in good workmanlike manner. . . .

The restrictive covenants also contain provisions regulating setbacks and sidelines for dwellings constructed on each lot.

ARCHDS purchased a lot in North Hills and employed Westminster Company (hereinafter Westminster) to construct a dwelling on the lot designated as 2402 Dogwood Avenue. The single story dwelling constructed by Westminster contains approximately 3,694 square feet under a single roof, with 3,207 square feet heated floor space. The structure is more than twice the size of any other residence in the subdivision. The structure

has five exterior doors having commercial type locks. Entrances to the dwelling provide barrier free access. The dwelling is served by a single electrical circuit and two air conditioning units and two furnaces connected to a common duct system. The dwelling has two mechanical rooms.

The interior of the dwelling has six bedrooms, three bathrooms, one lavatory, two living rooms, one den, and one large kitchen. Passageways provide barrier free access, and the interior design utilizes nonslip flooring, lowered electrical outlets and switches, and lowered shelves to reduce the risk of injury to the disabled residents. The supervisory personnel occupy a living area of approximately 361 square feet. This area has the necessary electrical and plumbing connections for a separate efficiency kitchen even though they are not currently connected (stubbed-in). The supervisor's living area is connected to the living area used by the developmentally disabled adults by a single exterior-type door. A commercial type lock system was employed which permits one master key and at least two submaster keys; one of which is for the supervisory living area. Each bedroom for disabled adults is opened by a separate key. Many of the exterior and interior features of the ARCHDS facility were required by the Housing and Urban Development (hereinafter HUD) regulations in order for ARCHDS to qualify for low interest loans, by the requirements of the North Carolina Department of Human Resources (hereinafter NCDHR), the licensing authority for group care homes in this state, and by applicable building codes.

The group care home provides environmental and emotional support to five handicapped residents. The residents are not biologically related. The group care home operates as a single economic unit, the supervisory personnel acting as surrogate parents. Residents are assigned usual household chores; i.e., cooking, shopping, cleaning and maintenance. No professional counseling or medical services are provided on the premises. The residents participate in activities away from the dwelling during the day, the activities include sheltered workshops, professional rehabilitation or habilitation training, and, on occasion, employment in the private sector. Expenses for the group care facility are paid from a common operating fund. The common fund receives monies from direct federal, state, and local government grants and monies from social security benefits and other support

programs paid to or on behalf of the disabled residents. Supervisory personnel are salaried and paid directly by the Neuse River Center for Mental Health, Mental Retardation, and Substance Abuse.

Plaintiffs twice petitioned the court for temporary injunctions; first, during construction, and, second, after construction but prior to occupancy. Temporary injunctions were denied on both occasions. Defendants then moved for summary judgment, and the trial court granted summary judgment to all defendants on 25 July 1984.

*Dunn & Dunn, by Raymond E. Dunn and Raymond E. Dunn, Jr., for plaintiffs.*

*Moore, Van Allen, Allen & Thigpen, by Joseph W. Eason, and Attorney General Rufus L. Edmisten, by Assistant Attorney General Robert R. Reilly, for the Association for Retarded Citizens for Housing Development Services, Inc.*

*Stith and Stith, P.A., by Lawrence A. Stith, for Westminster Company.*

WELLS, Judge.

Plaintiffs bring forth one assignment of error in which they contend that the trial court erred in granting summary judgment. Plaintiffs contend that the nature of the structure erected by ARCHDS presents a material question of fact: whether the structure is a single family residential dwelling within the meaning of the North Hills Subdivision restrictive covenants. They also argue that if there is no genuine issue as to any material fact, the trial court erred by granting defendants' motion for summary judgment. We find that the trial court properly entered summary judgment for all defendants.

Under N.C. Gen. Stat. § 1A-1, Rule 56 of the Rules of Civil Procedure (1983), a defendant moving for summary judgment:

> [I]s entitled to summary judgment only if he can produce a forecast of evidence, which, when viewed most favorably to plaintiff, would, 'if offered by plaintiff at the trial, without more, . . . compel a directed verdict' in defendant's favor. *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 473, 251 S.E. 2d

419, 423 (1979). In other words, if the forecast of evidence available for trial, as adduced on the motion for summary judgment, demonstrates that plaintiff will not at trial be able to make out at least a *prima facie* case, defendant is entitled to summary judgment. *Dickens v. Puryear,* 302 N.C. 437, 276 S.E. 2d 325 (1981). In such cases there is no genuine issue of material fact. *Moore v. Fieldcrest Mills, Inc., supra.*

*Mims v. Mims,* 305 N.C. 41, 286 S.E. 2d 779 (1982) (emphasis in original); *see generally* W. Shuford, *N.C. Civ. Prac. and Proc.* § 56-7 (2nd ed. 1981). Applying these principles to the forecast of evidence before the trial court, we must first determine the structural requirements imposed by the North Hills Subdivision restrictive covenants, and then determine whether the forecast of evidence in this case indicates that any issue of material fact remains as to whether the ARCHDS group care facility violates the restrictive covenants.

In *Hobby & Son v. Family Homes,* 302 N.C. 64, 274 S.E. 2d 174 (1981), our supreme court stated the general rules applicable to the enforcement of restrictive covenants:

> While the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, . . . such covenants are not favored by the law, . . . and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. . . . The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent. . . . Even so, we pause to recognize that clearly and narrowly drawn restrictive covenants may be employed in such a way that the legitimate objective of a development scheme may be achieved. Provided that a restrictive covenant does not offend articulated considerations of public policy or concepts of substantive law, such provisions are legitimate tools which may be utilized by developers and other interested parties to guide the subsequent usage of property.
>
> . . . each part of the covenant must be given effect according to the natural meaning of the words, provided that

the meanings of the relevant terms have not been modified by the parties to the undertaking. . . . [Citations omitted.]

In a previous case, this court interpreted the North Hills Subdivision restrictive covenants. In *Higgins v. Builders and Finance, Inc.*, 20 N.C. App. 1, 200 S.E. 2d 397 (1973), *cert. denied*, 284 N.C. 616, 201 S.E. 2d 689 (1974), this court held that the language of the covenant providing that "[n]o structure shall be erected, altered, placed or permitted to remain on any lot other than for use as a single family residential dwelling" imposed both a "use" restriction and a "structural" restriction. In reaching its decision, the *Higgins* court held:

In clear language the restriction prohibits the erection, altering, placing or permitting to remain on any lot of any structure other than for use as a single family residential dwelling. Erecting on any lot or permitting to remain thereon any duplex house, even though it remain vacant and unoccupied and not "used" at all, even by one family, would be a violation of the covenant.

*Higgins v. Builders and Finance, Inc., supra.* The *Higgins* court's interpretation of the North Hills Subdivision's covenants is applicable to the facts of the case before us under the doctrine of *stare decisis. McGill v. Lumberton*, 218 N.C. 586, 11 S.E. 2d 873 (1940).

Plaintiffs concede that the ARCHDS group health care facility is a "residential" use of the dwelling. The law in this state clearly comports with plaintiffs' position. N.C. Gen. Stat. §§ 168-22 and -23 (1982); *see also Hobby & Son v. Family Homes, supra* (holding that group health care facility was a "residential" use as opposed to an institutional use of the property. In *dicta*, the *Hobby* court stated, "[w]hile we deem it unnecessary to reach the question of whether the individuals living at the [group care] home constitute a family, we are compelled to observe that the surrogate parents and the adults subject to their supervision function as an integrated unit rather than independent persons who share only the place where they sleep and take their meals as would boarders in a boarding house").

Plaintiffs contend that their forecast of evidence substantiates their contention that the ARCHDS dwelling is institutional

in design, and, therefore, non-conforming. First, they argue that the ARCHDS structure is composed of two separate units; one for the adult supervisory personnel and one for the disabled adults. Second, they note that the ARCHDS dwelling has twice the square footage as any other dwelling in the subdivision. Third, they contend that the dwelling incorporates institutional design features such as a commercial lock system, five exterior doors and entrances to the dwelling, barrier free access, and two separate mechanical rooms. These facts are undisputed by defendants.

The ARCHDS group care home contains some 3,694 square feet under a single roof and is twice the size of other homes in the North Hills Subdivision. Furthermore, in order to obtain federal flood insurance protection, as required by HUD, the lot on which the structure was built was elevated five feet prior to construction. The restrictive covenants in issue only prohibit construction of dwellings with less than 1,200 square feet of floor space. No maximum size is established beyond the limitations imposed by setback and sideline covenant restrictions and applicable building codes. No covenant provision prohibits elevation of the construction site. The record establishes that the ARCHDS structure meets all covenant standards relating to setback and sidelines and complies with all applicable building code requirements.

The commercial lock system, five exterior doors and entrances to the facility, exterior barrier free access, and two separate mechanical rooms do not violate any covenant requirement *per se*. It is undisputed that these features comply with the terms of the restrictive covenants requiring use of materials of good quality and workmanship. Furthermore, these deviations from the typical suburban family residence are necessary to accommodate the developmentally disabled adults residing in the structure and comply with HUD, NCDHR, and building code requirements for group care homes.

The group care supervisory personnel live in a 361 square foot living area that is separated from the disabled adults. This area contains a separate living room, bedroom, and bathroom. The plumbing, exterior venting, electrical receptacles, and wiring necessary for a separate kitchen were stubbed-in the walls and

floors. The supervisory personnel's living area is separated from the rest of the living area by walls and an interior doorway using an exterior-type door rather than an interior-type door. All the locks in the supervisory personnel's living area use different keys than those used in the living area of the disabled adults. These design features do not violate any specific restrictive covenants.

Plaintiffs contend that the ARCHDS dwelling is similar to the structure determined to be in violation of the restrictive covenants in *Higgins*. The builder, in *Higgins*, had constructed duplex apartments. The trial court issued a restraining order prohibiting further construction. A consent order was entered in which the builder was to modify the structure to conform with the North Hills Subdivision restrictive covenants. The builder subsequently placed one doorway in the common wall in each duplex and left one stubbed-in kitchen in each duplex. Plaintiffs, in that case, contended that the structural changes did not alter the character of the duplexes. The trial court issued a mandatory injunction for the removal of the duplexes. The trial court relied on numerous factors in finding that the buildings erected did not conform with the North Hills Subdivision restrictive covenants: (1) intent of the builder to construct duplexes, (2) general outside appearance as a duplex, (3) separate electrical meters and systems, (4) separate utility rooms, (5) separate kitchens and laundry areas, (6) separate postal enumerations, and (7) separate heating and cooling systems. The trial court concluded as a matter of law that installing one doorway in the common duplex interior wall and stubbing-in one kitchen did not convert the building into a single family residence so as to conform with the restrictive covenants. The builder was ordered to submit another plan to convert the structures into single family structures. The builder offered a plan suggesting minor structural changes, which the trial court again rejected. The *Higgins* court classified the defendant's alteration of the duplexes by inserting a doorway in the common walls and finishing only one kitchen as "minor" alterations, and found that all of the trial court's remaining findings of fact tended to show that the structure was not a single family structure.

The *Higgins* duplex is clearly distinguishable from the ARCHDS dwelling. The ARCHDS group care home is designed to house an extended family. The general outside appearance of the

structure is that of a single family residence, albeit with barrier free access for the disabled adults living therein. The dwelling is serviced by common electrical, heating, cooling, and plumbing systems. Furthermore, the dwelling has but one postal designation.

We hold that based on the principles of construction enunciated in *Hobby* the plaintiffs' forecast of evidence shows that the ARCHDS structure conforms to the requirement of single family design and construction. The ARCHDS dwelling has the outward appearance of a single family residence except for those modifications necessary to use the dwelling for handicapped individuals; *i.e.*, barrier free access and extra doors. Furthermore, the unique interior modifications are those minimally necessary to accommodate the disabilities of the residents. Most of the exterior and interior structural changes were required by either federal, state, or local regulations. The restrictive covenants do not specifically prohibit the structural features of which plaintiffs complain, and nothing in the covenants would prohibit an existing resident of the community from altering a home to accommodate a handicapped family member. We conclude that the trial court, therefore, properly entered summary judgment for defendants. *Mims v. Mims, supra.*

Our decision makes it unnecessary for us to address either plaintiffs' assignments of error relating to the applicability of G.S. §§ 168-23 and -24 to "structural" limitations imposed by restrictive covenants or the constitutionality of the statute as applied to "structural" restrictions contained in restrictive covenants.

Our decision ought not to be interpreted to mean that restrictive covenants cannot be drafted so as to regulate the character of the structures erected in a neighborhood or their utilization. *Hobby & Son v. Family Homes, supra.* The North Hills Subdivision restrictive covenants simply do not prohibit the type of structure constructed by the ARCHDS.

The trial court's entry of summary judgment for all defendants must be and is hereby

Affirmed.

Judges JOHNSON and EAGLES concur.