DAVIS, Judge.
Richard Makar and his wife Teresa Makar appeal from a 4 December 2017 order entered by the trial court denying their motion for summary judgment and granting the cross-motion for summary judgment of defendant Mimosa Bay Homeowners Association, Inc. (the "HOA"). After a thorough review of the record and applicable law, we reverse the trial court's grant of summary judgment to the HOA and remand for entry of summary judgment in favor of the Makars.
Factual and Procedural Background
Mimosa Bay is a residential subdivision located in Sneads Ferry, North Carolina that consists of a planned, gated community. It was created on 16 June 2005 upon the recordation of a document entitled "Declaration of Covenants Conditions and Restrictions For Mimosa Bay Subdivision" (the "Declaration") by Blue Marlin, L.L.C. ("Blue Marlin"), the developer. The Declaration was signed by Blue Marlin's manager, Gordon Frieze and stated that the HOA would be incorporated as a nonprofit corporation for the purpose of managing the community's affairs. The Declaration also provided for a "Period of Declarant Control" prior to the establishment of an HOA Executive Board. It is undisputed that the HOA did not have an Executive Board until 2016.
Article III of the Declaration provided for the creation of an Architectural Review Committee (the "ARC"):
SECTION 7. Architectural Review Committee. The Executive Board shall perform all duties of the Architectural Review Committee if no such committee is appointed by it, subject, however, to the Special Declarant Rights. During the Period of Declarant Control, the Declarant shall appoint all members of the Architectural Review Committee by appointing any persons it deems fit (Owners or non-Owners). Any Architectural Review Committee appointed by the Executive Board shall consist of at least 3 members.
The duties and powers of the ARC were set out in Article VII of the Declaration as follows:
SECTION 1. Approval of Plans for Building and Site Improvements. No dwelling, wall, tent or other structure shall be commenced, erected, or maintained upon any Lot, nor shall any exterior addition to or change in or alteration therein (including painting or repainting of exterior surfaces) be made until the plans and specifications showing the nature, kind, shape, heights, materials, colors and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Architectural Review Committee. If the Architectural Review Committee fails to approve or disapprove such design and location within forty-five (45) days after said plans and specifications have been submitted to it, approval will not be required and this Article will be deemed to have been fully complied with. Refusal or approval of any such plans, location or specification may be based upon any ground, including purely aesthetic and environmental considerations, that in the sole and uncontrolled discretion of the Architectural Review Committee shall be deemed sufficient.
With regard to the construction of fences by lot owners, the Declaration specifically stated that "[f]ences shall be permitted on any Lot; provided, however, that the design, placement, and materials of any fence are approved by the Architectural Review Committee."
In 2012, the Makars purchased a home in Mimosa Bay. On 10 April 2014, the HOA adopted the "Mimosa Bay Design Review Guidelines," which addressed, among other things, the types of fencing that homeowners would be permitted to construct on their lots.
In order to maintain the views within this wooded, natural setting, fences will be discouraged. However, the [Mimosa Bay ARC], upon petition by the property owner, may approve some fencing for unique reasons, such as the Owner has a dog. Such petition must justify use of the fencing. The [Mimosa Bay] ARC has sole discretion over size, material(s) and location of such fencing.
....
A 4-foot solid fence for the sole purpose of privacy will be permitted. The maximum height for any fence will be set at 5 feet and any fence over 4 feet must be a picket style fence.
In March 2015, the Makars constructed a wooden fence on their property that varied in height from 67 to 74 inches. On 25 March 2015, they received a "Notice of ARC Violation" from the HOA. The notice stated, in pertinent part, as follows:
It has come to our attention that an Architectural Change has been made to your home. All Architectural changes must be submitted to and approved by the Architectural Committee so that we preserve the appearance and architectural harmony of the community. Attached is a copy of the Architectural Change Form for your convenience. Please complete the form and submit it ... for approval.
....
You have begun work on construction of a new fence with no ARC application or approval on file. Please stop all work until the proper forms are submitted and the request is approved.
....
If you cannot comply with this request within the next thirty (30) days or feel that the request is unfair, you have the right of appeal to the community's elected Board of Directors.
The Makars submitted an application on 27 March 2015 requesting permission to keep the fence on their property. As provided on the application form, the Makars submitted the form via email to "Gordon Frieze, MBARC Chairman[.]"
On 15 April 2015, the Makars received a letter from Frieze stating that "the ARC has determined that you have acted in direct disregard of the ARC Guidelines by not obtaining ARC pre-approval before installing your fence. Accordingly, no variance will be issued to authorize your non-compliant, 6 foot, solid wooden privacy fence." The letter further stated as follows:
The Board is exercising its discretion and grants you 30 days from the date of this notice to bring your fence into compliance with governing rules, by your election from amongst the following three options: (1) remove the fence; (2) if you wish to retain a privacy fence, the height must be reduced to not exceeding 4 feet; or (3) if you wish to retain a 5 foot fence, it must be converted to [sic] picket style fence. You may refer to the Mimosa Bay Design Review Guidelines (Rev. April 10, 2014) for further guidance.
Frieze signed the letter in his capacity as "Architect[ural] Review Chairman."
In his deposition testimony, Frieze elaborated upon the decision to deny the Makars' application:
[MAKARS' ATTORNEY]: Who made the decision on whether it would be approved?
[FRIEZE]: I did as head of the ARC.
[MAKARS' ATTORNEY]: Did you do that together with any other persons?
[FRIEZE]: I did not. Excuse me. Sheri in my office, Sheri Smothers, she is always there. We do ARC together. Okay? She submits -- Excuse me. She makes sure that all of the applications are complete and then we sit down together to review them. Okay?
[MARKARS' ATTORNEY]: Did Sheri have input into your decision-making whether or not the fence application would be approved?
[FRIEZE]: Did she have input? I don't recall. I don't remember the conversation.
[MAKARS' ATTORNEY]: Was there a vote or anything like that? Or was it just a discussion?
[FRIEZE]: It would have been a discussion.
[MAKARS' ATTORNEY]: And if you and Sheri disagreed - Did you and Sheri disagree?
[FRIEZE]: No, we did not.
[MAKARS' ATTORNEY]: And so both of you together decided that the fence application would not be approved?
[FRIEZE]: I don't remember that we both decided. I'm the deciding factor[.]
Despite their receipt of Frieze's 15 April 2015 letter, the Makars made no alterations to the fence. On 27 May 2015, the HOA sent the Makars a document titled "Hearing Notice." This notice informed the Makars that a hearing date before the HOA's Board of Directors had been scheduled for 9 June 2015 "to determine whether a fine should be imposed."
On 9 June 2015, the Makars attended the hearing and presented evidence. In his deposition, Frieze testified that in addition to himself and the Makars two other individuals were also present at the hearing. The first was John Bjerke, a member of the HOA's compliance committee. The second was a manager from Community Association Management Services (Mimosa Bay's property management company) named Danielle whose last name Frieze did not know. Frieze described the decision-making process that occurred after the hearing as follows:
[FRIEZE]: I came back to the office and I just -- I sat down and reviewed the evidence that was presented and just thought through it myself as to the impact of it and made the decision to deny him.
[MAKARS' ATTORNEY]: Did you discuss what decision should be made with Mr. Bjerke?
[FRIEZE]: No, I did not.
[MAKARS' ATTORNEY]: Did you discuss what decision should be made with Danielle through CAMS?
[FRIEZE]: No.
On 19 June 2015, the Makars received a letter - signed by Frieze in his capacity as "Board President" of the HOA - upholding the "previous denial of a height variance" for the Makars' fence. The letter stated that if the Makars did not "rectify [their] noncompliant fence" within three weeks, a fine of $50 per day would be imposed. The letter further provided that if the Makars' fence remained noncompliant after thirty days of fines the amount of the fine would double to $100 per day.
On 22 July 2015, the Makars received a "Fine Notice" from the HOA stating that the imposition of daily fines of $50 had begun on 10 July 2015 and that these fines would increase to $100 per day on 9 August 2015. When asked during his deposition who possessed the authority to impose such a fine, Frieze responded: "Strictly I did." He further testified that he chose the $50 and $100 amounts because Danielle had informed him that "the law allowed $100 a day fine." Frieze explained that he "wanted to start it at less than that and give them an incremental time to comply."
The Makars did not pay the fines. Instead, on 24 August 2015 they filed a civil action against the HOA in Onslow County District Court seeking a declaratory judgment "as to the legal effect of the [Declaration] as it relates to enforceability of restrictions against the fence" and relief from the fines imposed by the HOA.
The HOA notified the Makars by letter dated 26 October 2015 of its intention to impose a lien against their property for the total amount of the unpaid fines. On 16 November 2015, the HOA filed a lien against the Makars' property.
The HOA filed an answer on 14 January 2016 containing a motion to dismiss the Makars' complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure for failure to state a claim upon which relief can be granted. In addition, the HOA asserted counterclaims seeking (1) a declaratory judgment that the HOA possessed the authority to require approval for the Makars' fence and that the Makars had violated the Declaration in constructing the fence on their property; (2) an injunction requiring the Makars to either remove the fence or bring it into compliance with the HOA's governing documents; (3) a claim of lien for $11,075 in unpaid fines; and (4) a claim for breach of contract.
On 8 August 2016, the HOA filed a motion to transfer the lawsuit to superior court because the fines accrued by the Makars had "increased to an amount in excess of $25,000[.]" The motion was granted on 29 August 2016.
Both parties filed motions for summary judgment in Onslow County Superior Court on 19 October 2017. A hearing was held before the Honorable John E. Nobles, Jr. on 30 October 2017. By order entered 4 December 2017, the trial court granted the HOA's motion for summary judgment and denied the Makars' cross-motion. The order also required the Makars to "pay all fines, costs, and attorneys' fees[.]"
Analysis
On appeal, the Makars argue that the trial court erred by awarding summary judgment to the HOA and denying their own motion. Specifically, they contend that although the Declaration required their application to be reviewed by an ARC composed of multiple members Frieze instead exercised sole decision-making authority in denying their application for a variance. Consequently, the Makars assert, their fence should be deemed permissible under the Declaration due to the provision contained therein stating that all applications must receive a ruling within 45 days by a duly authorized committee or else the application will be deemed to be in compliance with the Declaration. We agree.
"On an appeal from an order granting summary judgment, this Court reviews the trial court's decision de novo ." Mitchell, Brewer, Richardson, Adams, Burge & Boughman v. Brewer , --- N.C. App. ----, ----, 803 S.E.2d 433, 443 (2017) (citation and quotation marks omitted), disc. review denied , 370 N.C. 693, 811 S.E.2d (2018). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Premier, Inc. v. Peterson, 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014) (citation and quotation marks omitted).
It is well established that "[t]he moving party has the burden of demonstrating the lack of any triable issue of fact and entitlement to judgment as a matter of law. The evidence produced by the parties is viewed in the light most favorable to the non-moving party." Hardin v. KCS Int'l, Inc., 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (internal citations omitted). We have held that "[a]n issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." In re Alessandrini , 239 N.C. App. 313, 315, 769 S.E.2d 214, 216 (2015) (citation omitted).
Our Supreme Court has held that "[r]estrictive covenants are legitimate tools of developers so long as they are clearly and narrowly drawn." Wise v. Harrington Grove Cmty. Ass'n , 357 N.C. 396, 401, 584 S.E.2d 731, 735 (2003) (citation and quotation marks omitted.) However, such covenants "are not favor[e]d by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land." J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc. , 302 N.C. 64, 70-71, 274 S.E.2d 174, 179 (1981). Furthermore, "where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted[.]" McVicker v. Bogue Sound Yacht Club, Inc. , --- N.C. App. ----, ----, 809 S.E.2d 136, 141 (2017) (citation and emphasis omitted).
Restrictive covenants are contractual in nature, and for this reason "[a] court will generally enforce such covenants to the same extent that it would lend judicial sanction to any other valid contractual relationship." Wise , 357 N.C. at 401, 584 S.E.2d at 736 (citation and quotation marks omitted). It is well established that "when an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter - the party responsible for choosing the questionable language." Novacare Orthotics & Prosthetics E., Inc. v. Speelman , 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000). "A contractual clause is ambiguous if the language used is fairly and reasonably susceptible to either of the constructions asserted by the parties" or "when the writing leaves it uncertain as to what the agreement was." Id . (citation and quotation marks omitted).
Our Supreme Court applied these principles to a dispute involving restrictive covenants in J.T. Hobby & Son, Inc . In that case, the defendant established a family care home for developmentally disabled adults on property located in a subdivision that was subject to restrictive covenants stating that lots within the subdivision could be used only "for residential purposes." J.T. Hobby & Son, Inc. , 302 N.C. at 65, 274 S.E.2d at 176. The covenants further provided that "[n]o building shall be erected, altered, placed or permitted to remain on any building unit other than one detached single-family dwelling ... and outbuildings incidental to residential use." Id. at 74, 274 S.E.2d at 181. The subdivision's developer brought an action seeking to enjoin the defendant from operating the adult care home, arguing, in part, that the language in the covenants restricting any building to a single-family dwelling likewise constituted a restriction on the usage of the property. Id.
The Supreme Court rejected the developer's position as "inconsistent with one of the fundamental premises of the law as it relates to restrictive covenants: Such provisions are not favored by the law and they will be construed to the end that all ambiguities will be resolved in favor of the free alienation of land."Id. The Court explained that "[a]n interpretation of the phrases which relate to a single-family dwelling as being a usage restriction would be to render them mere surplusage because nothing they contain adds anything to the concept of 'residential purposes' in a clear and distinct way." Id. at 75, 274 S.E.2d at 181 (quotation marks omitted). The Court concluded that "[w]hile a restrictive covenant may be so clearly and unambiguously drafted that it regulates the utilization of property through a structural limitation, such was not done in the present case." Id. at 75, 274 S.E.2d at 182.
In McVicker , this Court once again construed ambiguous restrictive covenants against a homeowners association. In that case, the plaintiffs were homeowners within a subdivision who began cutting trees and clearing brush on their property without first submitting an application to the Architectural Control Committee of the neighborhood homeowners association. McVicker , N.C. App. at ----, 809 S.E.2d at 138. The homeowners association sent a notice to the plaintiffs requiring that they stop cutting down trees until they submitted an application to the Architectural Control Committee along with a $250 construction bond. The plaintiffs filed a lawsuit seeking a declaratory judgment that the homeowners association lacked the authority to impose a construction bond under the subdivision's restrictive covenants. Id.
This Court held that the homeowners association was not permitted to require the payment of a construction bond because "[c]onstruing the [c]ovenants strictly, as this Court is required to do, Defendant does not have the express or implied authority to additionally require Plaintiffs to post a bond as a condition to consider their application for approval." Id. at ----, 809 S.E.2d at 142. In so concluding, we reiterated the well-established principle that where "the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted[.]" Id. at ----, 809 S.E.2d at 141-42 (citation and emphasis omitted).
In the present case, as noted above, the portion of the Declaration providing for the creation of an ARC provides as follows:
SECTION 7. Architectural Review Committee. The Executive Board shall perform all duties of the Architectural Review Committee if no such committee is appointed by it, subject, however, to the Special Declarant Rights. During the Period of Declarant Control, the Declarant shall appoint all members of the Architectural Review Committee by appointing any persons it deems fit (Owners or non-Owners). Any Architectural Review Committee appointed by the Executive Board shall consist of at least 3 members.[1]
It is undisputed by the parties that at all times relevant to this litigation the HOA was operating under the Period of Declarant Control and that no Executive Board was in existence. Therefore, the above-quoted language addressing the makeup of the ARC during the Period of Declarant Control is controlling.
We begin our analysis by noting that in every instance in which this provision of the Declaration refers to prospective ARC members that may be appointed by the Declarant it uses the plural form of each noun - "members," "persons," "Owners," and "non-Owners." See N.C. Nat'l Bank v. Goode , 298 N.C. 485, 490, 259 S.E.2d 288, 292 (1979) (holding that references in the plural contained in testator's will "weigh[ed] heavily in favor of the creation of multiple trusts" where terms of will were otherwise ambiguous (citation omitted)). Furthermore, the ordinary meaning of the term "committee" connotes a decision-making body comprised of more than one individual. See J.T. Hobby & Son, Inc. , 302 N.C. at 71, 274 S.E.2d at 179 ("Sound judicial construction of restrictive covenants demands that ... each part of the covenant must be given effect according to the natural meaning of the words[.]" (citation omitted)). Webster's Ninth New Collegiate Dictionary, for example, defines "committee" as "a body of persons delegated to consider, investigate, take action on, or report some matter[.]" Webster's Ninth New Collegiate Dictionary 265 (9th ed. 1991).
Moreover, to the extent that the Declaration is ambiguous with regard to the question of whether the ARC was required to be comprised of multiple persons during the Period of Declarant Control, any such ambiguity must be construed in favor of the Makars and against the HOA. See, e.g., Root v. Allstate Ins. Co. , 272 N.C. 580, 585, 158 S.E.2d 829, 834 (1968) ("[W]e are cognizant of the well-recognized rule that an ambiguity in a written contract is to be construed against the party who prepared the instrument." (citation omitted)). Therefore, we construe the Declaration as requiring that the ARC be comprised of more than one person during the Period of Declarant Control.
As a result of this determination, we are unable to agree with the HOA that the Makars' application was denied by a properly constituted ARC. With regard to the initial denial of their application, Frieze testified that although Sheri Smothers, an employee in his office, helped prepare the Makars' documents for his review, he was the "deciding factor" in the decision.
As for the decision to uphold the original determination denying the Makars' application following the 9 June 2015 hearing, Frieze testified that - despite the presence of Bjerke and Danielle at the hearing - no person other than himself played any role in the decision. Specifically, he testified that he "came back to the office and ... sat down and reviewed the evidence that was presented and just thought through it [himself] as to the impact of it and made the decision to deny him." Finally, regarding the decision to assess fines against the Makars, Frieze's testimony makes clear that he possessed the authority to impose such fines and that he likewise was the sole decisionmaker as to the amount of the fines.
Thus, it is abundantly clear from the record that at all times relevant to this case decision-making authority on behalf of the ARC rested with no one other than Frieze. Indeed, as far as the Makars' application was concerned, Frieze was the ARC and the ARC was Frieze. Such an arrangement in which Frieze served as the sole decisionmaker for the ARC is not permitted under the Declaration.
Thus, because 45 days passed following the submission of the Makars' application without the issuance of a valid ARC decision, we hold that the fence was deemed permissible under the terms of the Declaration. Furthermore, this means the fines imposed against the Makars were not authorized. Accordingly, the trial court erred in granting summary judgment to the HOA and in denying the Makars' cross-motion. We therefore reverse the trial court's order.[2]
Conclusion
For the reasons stated above, we reverse the trial court's 4 December 2017 order and remand for entry of summary judgment in favor of the Makars.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Report per Rule 30(e).
Judges HUNTER, JR. and BERGER concur.

"Special Declarant Rights" are defined, in pertinent part, in the Declaration as "rights reserved for the benefit of the Declarant including ... to appoint or remove any officer or Executive Board member of the Association ... or any member of the Architectural Review Committee during the Declarant Control Period[.]"

Based on our ruling, we need not address the additional arguments that the Makars have raised in this appeal.