MICHAEL SCHWARTZ AND DAWN GRAY, PLAINTIFFS v. BANBURY WOODS HOME-
OWNERS ASSOCIATION, INC., DEFENDANT

No. COA08-964

(Filed 5 May 2009)

**1. Deeds— restrictive covenants—motor home—campers and all similar property**

The trial court did not err in a declaratory judgment action by concluding that plaintiffs' motor home fell within the definition of "campers and all similar property" that was required to be parked in a garage or screened area as stated in Article XIV of the pertinent Declarations of Covenants, Conditions and Restrictions.

**2. Associations; Deeds— restrictive covenants—campers and all similar property—resolution defining "screened areas"—plaintiffs not targeted—enactment not arbitrary, unreasonable or in bad faith**

A subdivision homeowners association did not specifically target plaintiff homeowners and did not act arbitrarily, unreasonably, or in bad faith when it enacted a resolution defining the term "screened areas" for the purpose of enforcing a restrictive covenant requiring campers and all similar property to be parked in a garage or screened area, and the association could thus enforce the covenant in accordance with the resolution, where the association's board of directors had been considering and debating this issue for at least two years prior to plaintiffs' ownership of a lot in the subdivision.

**3. Deeds; Injunction— restrictive covenants—mandatory injunction—not overly broad or excessive**

An injunction issued by the trial court requiring that subdivision homeowners comply with the screening requirements of a subdivision restrictive covenant when parking their motor home on their subdivision lot was a proper exercise of the court's discretion and was not overly broad or excessive.

**4. Associations; Deeds— restrictive covenants—fines for violation**

A subdivision homeowners association validly assessed and collected $400 in fines pursuant to N.C.G.S. § 47F-3-107.1, the statute governing procedures for imposing fines in planned communities, against homeowners who violated a subdivision restric-

tive covenant requiring them to keep their motor home in a garage or approved screened area.

Appeal by plaintiffs from orders entered 17 December 2007 by Judge Donald W. Stephens, 4 January 2008 by Judge Paul C. Ridgeway, and 13 May 2008 by Judge Orlando F. Hudson, Jr. in Wake County Superior Court. Heard in the Court of Appeals 26 January 2009.

*Linck Harris Law Group, PLLC, by David H. Harris, Jr., for plaintiffs-appellants.*

*Jordan Price Wall Gray Jones & Carlton, by Henry W. Jones, Jr., and Brian S. Edlin, for defendant-appellee.*

MARTIN, Chief Judge.

Michael Schwartz and Dawn Gray (collectively "plaintiffs") appeal from orders denying their motions for a temporary restraining order, a preliminary injunction, and partial summary judgment, and granting defendant Banbury Woods Homeowners Association's motion for summary judgment. For the reasons discussed below, we affirm.

On 20 August 1985, the Declarations of Covenants, Conditions and Restrictions ("CC&Rs") for defendant and the Banbury Woods Subdivision were recorded in the Wake County Register of Deeds. When it was first recorded in 1985, Article XIV of the CC&Rs provided as follows:

Parking. Adequate off-street parking shall be provided by the owner of each lot for the parking of motor vehicles owned by such owner, and owners of lots shall not be permitted to park their automobiles on the streets in the development. Owners of lots shall not be permitted to park boats, trailers, *campers and all other similar property* on the streets in the development, and such property *shall be parked in a garage or screened area.*

(Emphasis added.) On 17 August 2005, Amendments to the 1985 CC&Rs were recorded, which modified the last sentence of Article XIV as follows:

Owners of lots shall not be permitted to park boats, trailers, campers and all similar property on the streets in the development, and such property shall be parked in a garage or screened

area *which is approved by the Architectural Committee in accordance with rules governing such items adopted by the Board of Directors of the Association.*

(Emphasis added.)

On 29 December 2005, plaintiffs became the record owners of the property located at 1500 Acres Way in Raleigh, North Carolina, in the Banbury Woods Subdivision. Plaintiff Gray is also the titleholder of a 2004 Tioga self-propelled motor home, which plaintiffs use "for overnight travel as a portable hotel room" and "as an extra automobile, in the same way that someone might use a truck or large passenger van." Plaintiffs also use their motor home for extra refrigerator and freezer space, and as a " 'granny unit,' a place for visitors to sleep where they have their own 'apartment' accommodations." In May 2006, "after completing improvements that provided additional parking space next to the garage as well as driving access to the concrete pad [behind the garage]," plaintiffs began parking their motor home on their Banbury Woods property.

On 6 June 2006, defendant's Architectural Committee Chairman Dick Brady spoke with plaintiff Schwartz about plaintiffs' decision to park their motor home on their Acres Way property. The next day, Brady and plaintiff Gray corresponded by e-mail regarding Brady's assertion that plaintiffs' motor home was subject to the parking restrictions identified in Article XIV of the CC&Rs. In his 7 June 2006 e-mail, Brady stated, "I don't believe we interpret the covenants to say that you can never have your boat/trailer/RV parked in your driveway but that it cannot be parked there as a means of permanent storage." Brady advised, "I don't see any way that you could screen something as big as an RV with shrubs so, if you want to store the vehicle in the neighborhood, I think fencing is the only viable option." "The bottom line, I think, is that you need to either enclose your RV with a fence or appeal to the Board." "You would need to convince the Board that [(a)] your RV does not violate the covenants, or [(b)] you should be exempt from the existing restrictions or [(c)] you should be allowed to screen your RV by other than the currently accepted methods."

On 11 October 2006, Brady sent a letter to plaintiffs stating, "It has now been 4 months since our original discussion and nearly 2 months since our follow-up discussion regarding the screening of your RV." "As the Architectural Committee has still not received a request for approval from you regarding your screening plan, it is my

SCHWARTZ v. BANBURY WOODS HOMEOWNERS ASS'N

[196 N.C. App. 584 (2009)]

obligation to the Association to formalize this issue by way of written documentation and establishment of a timeline for compliance." Brady requested that plaintiffs submit a Request for Architectural Approval for their planned screening method no later than 10 November 2006, and stated that failure to comply "may result in fines being levied by the Association."

Plaintiffs submitted a Request for Architectural Approval to construct a "privacy fence" on 1 November 2006. On 13 November 2006, the Architectural Committee denied plaintiffs' request, stating, "Fence architecture is fine but may not provide significant screening. The Board has requested that you delay any efforts to screen your RV until further notice." In a letter to plaintiffs following the Architectural Committee's denial, Brady wrote, "Until such time as you receive further direction from the Architectural Committee and/or the Board of Directors, you will not be liable for or subject to any fines or other punitive actions specific to the storage and screening of your RV."

Correspondence continued on this issue during Spring 2007 between plaintiffs and both defendant's President Edward C. Lingenheld, and defendant's Architectural Committee then-Chairman Howard A. Goodman. On 17 September 2007, Goodman sent a letter to plaintiffs stating, "The only solution that appears to have a chance of meeting screening requirements per our Covenants would involve a plantings approach. . . . Therefore I am writing to ask that you submit a Request for Approval (RFA) proposal of your own to resolve this issue." Goodman requested that plaintiffs submit their proposal by 30 September 2007 in order to avoid "an official notice of violation of covenant from [defendant's] independent inspector, which if ignored could result in monetary fines, as stipulated by [defendant's] Covenants and Resolution 1993-1, Rev. 1." On 28 September 2007, plaintiffs sent a letter to Goodman requesting an extension until the end of October 2007 to complete their research and submit their proposal.

On 2 October 2007, defendant's covenants inspector sent a Covenants Violation Notice to plaintiffs stating that "proper screening is required for the camper parked behind your home" and that the manner in which they parked the motor home "d[id] not appear to be in compliance with Banbury Woods Covenants, Article XIV." The covenants inspector requested that plaintiffs take action "within the next 30 days" to correct the violation. On 4 October 2007, Goodman sent a letter to plaintiffs "confirm[ing] that [they] currently have until

October 23, 2007, to submit to [sic] an Architectural Review Request with proposal for adequate screening of your recreational vehicle (RV)." Goodman continued, "If your proposal is submitted any later than that, we cannot guarantee a decision and response before November 1, 2007, by which time our independent covenant violations inspector will have conducted her monthly inspection and may have to issue a *second* violation notice." Goodman further wrote:

> According to Banbury Woods Covenants, and in particular Policy Resolution 1993-1 Rev. 1, fines may be levied. For your information, this Policy Resolution states that the fine for a first non-compliance or violation is to be "not in excess of Fifty Dollars.["] Second non-compliance or violation: "not in excess of One Hundred Dollars." Third and subsequent non-compliance or violation (following homeowners' receipt of first and second Covenants Violation Notices) is "not to exceed One Hundred Dollars for each week and/or any portion of a week of continued violation or non-compliance." . . .

> Receipt of your Architectural Review request and proposal will, in my opinion, effectively "stop the clock" on penalties such as fines at least until the outcome of the committees's review.

On 23 October 2007, plaintiffs' counsel sent a letter to Lingenheld and Goodman stating that plaintiffs did not believe they were in violation of the CC&Rs and asserting that plaintiffs would "not be submitting any request for Architectural Committee approval." On 5 November 2007, defendant's Covenants Inspector sent a Covenants Violation Second Notice to plaintiffs, citing plaintiffs' continued violation of Article XIV. The notice stated that plaintiffs needed to provide a screening proposal and if the matter was not "taken care of within the requested time frame[,] further action will be pursued."

On 6 November 2007, Lingenheld sent a letter to plaintiffs advising that, in light of the Covenants Violation Second Notice, "failure to correct the violation within 7 days will result in the assessment of penalties," (internal quotation marks omitted), and that plaintiffs will be subject to an "escalating system of fines that would continue until [plaintiffs] have complied with Article XIV regarding the required screening of your RV/Camper." Lingenheld further stated that fines would not begin to be assessed until plaintiffs had the chance to meet with defendant's Board of Directors to appeal the matter, and invited plaintiffs to meet with the Board during the week of 26 November 2007. Plaintiffs did not respond to Lingenheld's 6 November letter.

On 30 November 2007, Lingenheld sent a letter to plaintiffs' counsel advising that defendant's Board of Directors determined plaintiffs were in violation of Article XIV. Lingenheld stated that the Board "further decided to impose a fine of $100.00 per violation in accordance with [N.C.]G.S. § 47F-3-107.1," which would be assessed daily beginning 7 December 2007 "until [plaintiffs] bring themselves into compliance with the [CC&Rs]." After incurring $400.00 in fines, plaintiffs relocated their motor home to an off-site storage facility.

Plaintiffs filed a "Complaint and Motion for Rule 65 Relief" in Wake County Superior Court on 11 December 2007. Plaintiffs sought a declaratory judgment stating that their motor home did not "fall within the purview of Article XIV." Plaintiffs also asked the court to declare that defendant's Policy Resolution 2007-1—which defined the term "screened" as used in Article XIV of the CC&Rs—"and its implementation against [p]laintiffs is an arbitrary action in violation of Chapter 47F." Plaintiffs further sought a temporary restraining order and preliminary injunction against defendant from imposing any fines or "taking any punitive actions against [p]laintiffs for any alleged violation of CC&R Article XIV with regard to [p]laintiff's motor home" until the matter was heard and decided on the merits.

On 17 December 2007, the trial court denied plaintiffs' motion for a temporary restraining order. On 4 January 2008, the court denied plaintiffs' motion for a preliminary injunction, and "specifically [found] that the [p]laintiffs have an adequate remedy at law under the provisions set forth in Chapter 47F of the General Statutes, including without limitation, [N.C.G.S.] § 47F-3-116." On 28 January 2008, plaintiffs filed a Motion for Summary Judgment. On 5 February 2008, plaintiffs filed an Amended Motion for Partial Summary Judgment. On 21 April 2008, plaintiffs filed a Second Amended Motion for Partial Summary Judgment.

On 11 February 2008, defendant filed its Affirmative Defenses, Motion to Dismiss, Answer and Counterclaim. Defendant sought a permanent injunction "staying and enjoining the [p]laintiffs . . . to keep their camper out of the [Banbury Woods] Subdivision unless it is properly screened in compliance with the [CC&Rs]." Plaintiffs filed a reply to defendant's counterclaim on 25 March 2008. Defendant filed a Motion for Summary Judgment on 22 April 2008.

On 1 May 2008, the superior court heard plaintiffs' Second Amended Motion for Partial Summary Judgment and defendant's Motion for Summary Judgment. On 13 May 2008, the court entered its

order in which it denied plaintiffs' Second Amended Motion for Partial Summary Judgment and granted defendant's Motion for Summary Judgment. The court "specifically [found] that [p]laintiffs' Tioga Class C Motor Home falls within the definition of 'camper and all similar property' as stated in Article XIV of the Declaration of Covenants, Conditions and Restrictions for Banbury Woods Subdivision, as amended," and ordered plaintiffs to comply with Article XIV of the CC&Rs by *not* parking their motor home on their lot "unless it is in a garage or screened area which is approved by [defendant's] Architectural Committee in accordance with the rules and regulations governing such items adopted by the [defendant's] Board of Directors . . . pursuant to Article XIV of the [CC&Rs]." The court further determined that the fines "were validly assessed and collected" by defendant. Plaintiffs gave notice of appeal to this Court on 22 May 2008 from the following orders: the 17 December 2007 order denying plaintiffs' motion for a temporary restraining order; the 4 January 2008 order denying plaintiffs' motion for a preliminary injunction; and the 13 May 2008 order denying plaintiffs' Second Amended Motion for Partial Summary Judgment, granting defendant's Motion for Summary Judgment, and issuing a Mandatory Injunction in favor of defendant.

---

"[T]he standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998). "An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972). "[O]n appellate review of an order for summary judgment, the evidence is considered in the light most favorable to the nonmoving party," *see Garner v. Rentenbach Constructors, Inc.*, 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999), and the order is reviewed *de novo. See Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004).

I.

[1] The first issue before this Court is whether plaintiffs' motor home falls within the definition of "campers and all similar property" as stated in Article XIV of the CC&Rs. We hold that it does.

"The law looks with disfavor upon covenants restricting the free use of land." *Cummings v. Dosam, Inc.*, 273 N.C. 28, 32, 159 S.E.2d 513, 517 (1968). "Because restrictive covenants are in derogation of the free and unfettered use of land, they are to be strictly construed in favor of the unrestricted use of property." *Rosi v. McCoy*, 319 N.C. 589, 592, 356 S.E.2d 568, 570 (1987). "The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent." *J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc.*, 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981). "Even so, we pause to recognize that clearly and narrowly drawn restrictive covenants may be employed in such a way that the legitimate objectives of a development scheme may be achieved." *Id.*

Although restrictive covenants must be strictly construed, "they should not be construed 'in an unreasonable manner or a manner that defeats the plain and obvious purpose of the covenant.' " *Hultquist v. Morrow*, 169 N.C. App. 579, 582, 610 S.E.2d 288, 291 (quoting *Cumberland Homes, Inc. v. Carolina Lakes Prop. Owners' Ass'n*, 158 N.C. App. 518, 521, 581 S.E.2d 94, 97 (2003)), *disc. review denied*, 359 N.C. 631, 616 S.E.2d 235 (2005). "In construing restrictive covenants, the fundamental rule is that the intention of the parties governs, and . . . their intention must be gathered from study and consideration of *all* the covenants contained in the instrument or instruments creating the restrictions." *Long v. Branham*, 271 N.C. 264, 268, 156 S.E.2d 235, 238 (1967). "However, this intention may not be established by parol. Neither the testimony nor the declarations of a party is competent to prove intent.' " *Hultquist*, 169 N.C. App. at 585-86, 610 S.E.2d at 293 (quoting *Stegall v. Hous. Auth. of Charlotte*, 278 N.C. 95, 100, 178 S.E.2d 824, 828 (1971)). Additionally, it is "not primarily the intention of the parties which the court is seeking, but the meaning of the words at the time and place when they were used." *Angel v. Truitt*, 108 N.C. App. 679, 682, 424 S.E.2d 660, 662 (1993) (internal quotation marks omitted). Doubt will be resolved in favor of "the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land." *Long*, 271 N.C. at 268, 156 S.E.2d at 239 (internal quotation marks omitted).

Here, Article XIV requires that "[a]dequate off-street parking shall be provided by the owner of each lot for the parking of motor ve-

hicles owned by such owner," and property owners "shall not be permitted to park their automobiles on the streets in the development." However, while the CC&Rs also restrain property owners from parking "boats, trailers, campers and all similar property" on the streets in the development, the CC&Rs further require that "boats, trailers, campers and all similar property" must be parked in a garage or screened area which is approved by the Architectural Committee in accordance with the governing rules adopted by defendant's Board of Directors. Thus, if the trial court erred by determining that plaintiffs' motor home falls within the definition of "campers and all similar property," then plaintiffs are exempt from the Article XIV screening requirements for their motor home.

The record does not contain any evidence regarding the circumstances surrounding the execution of the CC&Rs or the situation of the parties at the time the CC&Rs were executed. Additionally, there is no evidence before this Court to suggest that the term "campers" was modified in any way by the drafters to represent anything other than its natural meaning. *See Hobby*, 302 N.C. at 71, 274 S.E.2d at 179 ("[E]ach part of the covenant must be given effect according to the natural meaning of the words, provided that the meanings of the relevant terms have not been modified by the parties to the undertaking."). In fact, the only evidence in the record that directly bears on intent—the affidavit of Alton L. Smith, III, who "executed the Declaration in [his] capacity as an owner and Managing Partner of . . . the developer of Banbury Woods Subdivision"—is evidence that we cannot consider, since the declarations of a party are not competent to prove intent. *See Hultquist*, 169 N.C. App. at 585, 610 S.E.2d at 293.

Plaintiffs assert that selected provisions in Chapter 20 of the General Statutes make "clear that [plaintiffs' motor home] is not a 'camper.' " However, since the statutory provisions upon which plaintiffs attempt to rely were enacted between six and sixteen years *after* the CC&Rs referring to "campers and all similar property" were drafted and recorded, we conclude that these statutory provisions are not material to the issue of the drafters' intent in 1985, and plaintiffs' reliance on these provisions is misplaced. *See* 2001 N.C. Sess. Laws 1019-20, ch. 341, § 1 (enacting N.C.G.S. § 20-4.01(32a), which defines the terms "[t]ravel trailer" and "[c]amping trailer"); North Carolina Motor Vehicle Repair Act, 1999 N.C. Sess. Laws 1772-73, ch. 437, § 1 (enacting N.C.G.S. § 20-354B, which was renumbered as N.C.G.S. § 20-354.2 at the direction of the Revisor of Statutes and which

defines the term "[m]otor vehicle"); 1991 N.C. Sess. Laws 895-96, ch. 449, § 2 (enacting N.C.G.S. § 20-4.01(27)d2, which defines the term "[m]otor home or house car").

Thus, in the absence of any evidence of intent regarding the meaning of the term "camper," we must interpret the term consistent with its natural meaning, and must define the term according to its customary definition in 1985, when the CC&Rs were first drafted and recorded. *See Angel*, 108 N.C. App. at 683, 424 S.E.2d at 663. The 1985 edition of *Merriam-Webster's Collegiate Dictionary* defines "camper" as "a portable dwelling (as a specially equipped trailer *or automotive vehicle) for use during casual travel and camping.*" *Merriam-Webster's Collegiate Dictionary* 199 (9th ed. 1985) (emphasis added). The same dictionary defines "automotive" as "self-propelled." *Id.* at 118 (9th ed. 1985). Additionally, the term "motor home" is defined as "an automotive vehicle built on a truck or bus chassis and equipped as a self-contained traveling home." *Id.* at 775 (9th ed. 1985).

Plaintiffs maintain that their motor home is "self-propelled," and assert that they "use their [motor home] to travel to the grocery store and run errands *in addition to camping.*" (Emphasis added.) Further, although the term "motor home" is not expressly listed as a type of property that is subject to the screening requirements of Article XIV, based on the natural meaning of the term "camper" at the time the CC&Rs were drafted and recorded, we conclude that it would "defeat the plain and obvious purposes of [the parking] restriction" to strictly construe Article XIV so as to exclude plaintiffs' motor home from the ambit of this restrictive covenant. *See Long*, 271 N.C. at 268, 156 S.E.2d at 238-39 (internal quotation marks omitted). Therefore, we hold that plaintiffs' motor home falls within the definition of "campers and all similar property" in Article XIV of defendant's CC&Rs, and is subject to the screening requirements applicable to such property. Accordingly, we overrule this assignment of error.

II.

[2] Plaintiffs next contend the trial court erred by denying their Second Amended Motion for Partial Summary Judgment because defendant's Resolution No. 2007-1 was enacted for the purpose of "target[ing]" plaintiffs and, so, was arbitrary, capricious, unreasonable, and enacted in bad faith. We disagree.

On 8 November 1989, sixteen years prior to plaintiffs' ownership of their lot in the Banbury Woods Subdivision, defendant's Board of

Directors "recognize[d] the need for further interpretation" of the term "screened" as used in Article XIV of the CC&Rs, and so adopted Policy Resolution No. 1990-2, entitled "Screened Area Definition," which provided that

> "screened" shall mean an area within the rear lot space of such lot, which area shall be shielded from public view and observation from each adjoining lot by one of the following methodologies:
>
> 1. Planting of shrubbery of at least six feet in height along as many sides of the object to be screened as are necessary to screen such object from view from adjoining lots; or
>
> 2. Erection of a fence of appropriate height, quality, style and location and as approved pursuant to Article V of the [CC&Rs] . . . .

On 15 April 2007, defendant's Board of Directors unanimously adopted Policy Resolution No. 2007-1, which revised and superseded Policy Resolution No. 1990-2 as follows:

> "screened *AREAS*" shall mean an area within the rear lot space of such lot. *Such "Screened Area"* shall be shielded from public view, *including the streets within the Subdivision,* and observation from each adjoining lot by one of the following methodologies:
>
> 1. Planting of shrubbery of at least six feet in height *at the time of planting* along as many sides of the object to be screened as are necessary to screen such object from view; *Natural wooded areas are not a substitute for screening, but may be considered part of the screening depending on seasonal density;* or
>
> 2. Erection of a fence of appropriate height, quality, style and location and as approved *by the Architectural Committee* pursuant to Article V *and X* of the [CC&Rs] . . . .

(Emphasis added.)

Viewed in the light most favorable to the nonmoving party, the evidence before us shows that defendant had been addressing concerns about ongoing violations of Article XIV and examining its definition of "screening" as used in Article XIV *prior* to plaintiffs' acquisition of their lot in the Banbury Woods Subdivision at the end of

December 2005. For example, the evidence shows that, on 11 January 2004, the Architectural Committee reported to defendant's Board of Directors that the Banbury Woods Subdivision's covenant inspector issued five inspection violation notice letters in December 2003 and seven letters in January 2004 to property owners for violations which included "camper parking," "boat parking and screening," "boat screening," "trailer parking," and "boat or trailer parking." The Board's minutes from this meeting also included the following entry under "Covenants violations" in its "New Business" section:

> An overall review of our enforcement policies and practices began with the issue of boats, trailer[s], campers and the like that are parked on homeowners' lots. This type of violation is one of the most often cited by any of our inspectors. The covenants clearly call for such items to be parked in a garaged or screened area, the latter having been defined by the Board via Resolution No. 1990-2. While no documentation has been found, the Board seems to have adopted some practices that may be contrary to the intent of that resolution, e.g., approving visibility from the street, approving natural tree lines between properties as screening and approving plantings that are initially must less than 6 feet in height. The Board discussed whether the appropriate starting point was to rewrite the resolution from scratch or to agree on interpretation and possible amendment of the resolution as currently written. It was suggested and agreed that a good starting point would be to ask for the opinion of the community on what constituted appropriate parking and screening of these items. Dick will create an opinion poll and circulate to the Board for review. Susan will include the poll in her scheduled January publication.

As a result, defendant's 14 March 2004 Board meeting minutes reflect that a Feedback Survey was circulated to the homeowners and returned to the Board, prompting the Board to decide to rewrite the resolution addressing the screening requirements of Article XIV. The 23 May 2004 meeting minutes of defendant's Board further reflect the ongoing discussion about whether property subject to the screening requirements of Article XIV should be allowed to be visible from the street—an issue over which the Board "was split," until it resolved the issue by adopting Resolution No. 2007-1.

Thus, the evidence in the record demonstrates that defendant's Board of Directors had been considering and debating this issue for

at least two years prior to plaintiffs' ownership of their lot in Banbury Woods, and plaintiffs have produced no evidence that defendant "targeted" plaintiffs or acted arbitrarily, unreasonably, or in bad faith when defendant's Board passed Resolution No. 2007-1. Accordingly, we overrule this assignment of error.

III.

**[3]** In its 13 May 2008 order, the trial court decreed that, because "[p]laintiffs' Tioga Class C Motor Home falls within the definition of 'camper and all similar property' as stated in Article XIV of the [CC&Rs]," "[p]laintiffs are hereby ordered to comply with Article XIV of the [CC&Rs] by not parking their Tioga Class C Motor Home on their Lot *unless* it is in a garage or screened area which is approved by [defendant's] Architectural Committee." (Emphasis added.) Plaintiffs contend this injunction was "overly broad and excessive." We disagree.

"When enforcing a restrictive covenant and restoring the status quo, a mandatory injunction is the proper remedy." *Buie v. High Point Assocs. Ltd. P'ship*, 119 N.C. App. 155, 160, 458 S.E.2d 212, 216, *disc. review denied*, 341 N.C. 419, 461 S.E.2d 755 (1995). " 'Whether injunctive relief will be granted to restrain the violation of such restrictions is a matter within the sound discretion of the trial court . . . and the appellate court will not interfere unless such discretion is manifestly abused.' " *Id.* at 161, 458 S.E.2d at 216 (omission in original) (quoting 20 Am. Jur. 2d *Covenants, Conditions, and Restric-tions* § 313 (1965)).

Plaintiffs assert that they should be "entitled to the same rights to park the[ir motor home] on their property temporarily to clean it, maintain it, prepare it for trips and unload it following trips as long as they do not park it there 'as a means of permanent storage,' " but that they will be prohibited from doing so in light of the mandatory injunction issued by the trial court. To support their assertion, plaintiffs direct this Court's attention to an e-mail sent to them by defendant's Architectural Committee then-Chairman Dick Brady on 7 June 2006, in which Brady wrote:

Regarding your RV, I don't think I can agree with your examples of existing situations/violations although I can readily accept that there may be situations I am unaware of. I don't believe we interpret the covenants to say that you can never have your boat/trailer/RV parked in your driveway but that it cannot be

parked there as a means of permanent storage. I know there was a large RV parked in a driveway behind you. I discussed that with the homeowner and learned that the RV belonged to visiting guests and would be there for a couple of weeks. I did not consider this a problem because it clearly wasn't being parked there permanently. I am actually not aware of any other RVs that are being stored in Banbury Woods.

In other words, plaintiffs assert that defendant's prior decision to allow another motor home to be parked for a limited time on a home-owner's lot in the Banbury Woods Subdivision without being "screened" should allow plaintiffs to park their motor home on their property for limited purposes before and after it is used on trips.

However, we conclude the relief granted in the court's 13 May 2008 order was the same relief sought by defendant in its 11 February 2008 Counterclaim against plaintiffs, and requires only that plaintiffs comply with the screening requirements of Article XIV of the CC&Rs when parking their motor home on their lot in the Banbury Woods Subdivision. Since the court properly determined that plaintiffs' motor home is subject to the screening requirements of Article XIV, we conclude that the trial court did not manifestly abuse its discretion by issuing its 13 May 2008 injunction against plaintiffs, which required only that plaintiffs comply with the plain language of the CC&Rs. Thus, we hold the injunctive relief granted by the court to restrain plaintiffs from violating Article XIV was a proper exercise of the court's sound discretion, and was not overly broad or excessive. Accordingly, we overrule this assignment of error.

IV.

[4] Finally, plaintiffs contend the trial court erred by concluding that "the fines in this case were validly assessed and collected" by defendant. Again, we disagree.

The North Carolina Planned Community Act, codified in Chapter 47F of the North Carolina General Statutes, became effective as of January 1, 1999, and "applies to all planned communities created within this State on or after January 1, 1999." See N.C. Gen. Stat. § 47F-1-101 (2007); N.C. Gen. Stat. § 47F-1-102(a) (2007); N.C. Gen. Stat. § 47F-1-102 official commentary (2007). However, several provisions in the Chapter—including N.C.G.S. § 47F-3-107.1, which establishes procedures for imposing fines—"apply to all planned communities *created* in this State *before* January 1, 1999 [with re-

spect to events and circumstances occurring on or after January 1, 1999], unless the articles of incorporation or the declaration expressly provides to the contrary." N.C. Gen. Stat. § 47F-1-102(c) (emphasis added).

N.C.G.S. § 47F-3-107.1 provides, in part:

*Unless a specific procedure for the imposition of fines or suspension of planned community privileges or services is provided for in the declaration,* a hearing shall be held before the executive board or an adjudicatory panel appointed by the executive board to determine if any lot owner should be fined or if planned community privileges or services should be suspended pursuant to the powers granted to the association in G.S. 47F-3-102(11) and (12). . . . The lot owner charged shall be given notice of the charge, opportunity to be heard and to present evidence, and notice of the decision. If it is decided that a fine should be imposed, a fine not to exceed one hundred dollars ($100.00) may be imposed for the violation and without further hearing, for each day more than five days after the decision that the violation occurs. Such fines shall be shall be [sic] assessments secured by liens under G.S. 47F-3-116.

N.C. Gen. Stat. § 47F-3-107.1 (2007) (emphasis added); *see also* N.C. Gen. Stat. § 47F-3-116 (2007) (describing the procedures by which a property owners' association may seek to recover unpaid assessments).

In the present case, after defendant's covenants inspector issued a second violation notice to plaintiffs for failing to comply with the screening requirements of Article XIV for their motor home, defendant's Board of Directors President Lingenheld sent a letter to plaintiffs advising that " 'failure to correct the violation within 7 days will result in the assessment of penalties' " "as specified in Board Resolution No. 1993-1, Rev. 1." However, Lingenheld further stated that defendant's Board of Directors would "not initiate these fines . . . until [plaintiffs] . . . had a chance to meet with the Board to appeal." Lingenheld went on to suggest the date of 27 November 2007 for the meeting, and then wrote, "If that date does not work for you, please suggest one or two alternative dates during the week of November 26."

On 17 November 2007, Lingenheld sent another letter to plaintiffs, in which he indicated that defendant's Board of Directors "has

not received a response to [its] letter dated November 6." The letter continued that "the Board would be pleased to meet with you on Tuesday, November 27 to give you the opportunity to appeal the two violation notices you have received regarding screening for your RV/camper. . . . You may appear at that time should you wish to discuss the matter."

On 30 November 2007, Lingenheld sent a letter to plaintiffs' counsel stating that defendant's Board of Directors conducted a hearing on 27 November 2007 and determined that plaintiffs were in violation of Article XIV of the CC&Rs. Accordingly, Lingenheld stated that defendant would impose a fine of $100 "in accordance with G.S. § 47F-3-107.1," which would be assessed daily beginning 7 December 2007 "until [plaintiffs] bring themselves into compliance with the [CC&Rs]."

Since there is no evidence in the record that Resolution No. 1993-1 was added by amendment to the recorded CC&Rs at the time plaintiffs' fines were assessed against them in December 2007, we conclude that defendant was bound by statute to assess fines against plaintiffs in accordance with the procedures established in N.C.G.S. § 47F-3-107.1. *See* N.C. Gen. Stat. §§ 47F-1-102(c), 47F-3-107.1. Consequently, after reviewing the evidence before us, we hold that defendant properly complied with the procedural requirements of N.C.G.S. § 47F-3-107.1 prior to assessing $400 against plaintiffs for violating Article XIV. Accordingly, we overrule this assignment of error.

In light of our disposition, we need not consider plaintiffs' appeal with respect to the trial court's orders denying plaintiffs' motions for a temporary restraining order and a preliminary injunction.

Affirmed.

Judges BRYANT and BEASLEY concur.