IN THE SUPREME COURT OF NORTH CAROLINA

No. 249PA19-2

Filed 21 March 2025

ASHE COUNTY, NORTH CAROLINA

v.

ASHE COUNTY PLANNING BOARD AND APPALACHIAN MATERIALS, LLC

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 284 N.C. App. 563 (2022), reversing an order entered on 30 November 2017 by Judge Susan E. Bray in Superior Court, Ashe County. Heard in the Supreme Court on 2 November 2023.

*Womble Bond Dickinson (US) LLP, by William D. Curtis and John C. Cooke, for petitioner-appellee.*

*Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Craig D. Justus, Brian D. Gulden, and Jonathan H. Dunlap, for respondent-appellant Appalachian Materials, LLC.*

*No brief for respondent-appellee Ashe County Planning Board.*

*Law Offices of F. Bryan Brice, Jr., by F. Bryan Brice, Jr., Andrea C. Bonvecchio, Anne M. Harvey, and Dresden Hasala, for Blue Ridge Environmental Defense League and its chapter, Protect Our Fresh Air, amicus curiae.*

*Morningstar Law Group, by William J. Brian, Jr. and Jeffrey L. Roether, and J. Michael Carpenter, for the North Carolina Home Builders Association, Inc., amicus curiae.*

RIGGS, Justice.

This is the second appeal to this Court involving respondent Ashe County Planning Board's decision to issue a permit under Ashe County's Polluting Industries

Development Ordinance (the PID Ordinance) to respondent Appalachian Materials, LLC for construction of an asphalt plant. We previously held that the Court of Appeals erred in treating a letter from the local planning director expressing preliminary approval of the permit as a binding decision. *Ashe County v. Ashe Cnty. Plan. Bd.*, 376 N.C. 1, 19 (2020) (*Ashe County II*).[1] On remand for reconsideration in light of that holding, a divided panel of the Court of Appeals held that the superior court erred in affirming the Ashe County Planning Board's decision to issue the permit because: (1) the benefits of our "Permit Choice" statutes—allowing a developer to elect which version of an ordinance applies when it is changed during permitting, N.C.G.S. § 143-755 (2023), N.C.G.S. § 153A-320.1 (2019) (repealed 2021), and N.C.G.S. § 160D-108 (2023)—did not trigger until a "complete" application was submitted; (2) Appalachian Materials did not submit a "complete" application until after a temporary moratorium went into effect; (3) permit choice was available only if a "complete" application was submitted prior to the temporary moratorium; and (4) regardless, the application was also subject to denial because it failed to show compliance with the PID Ordinance's commercial building setback requirements. *Ashe County v. Ashe Cnty. Plan. Bd.*, 284 N.C. App. 563, 571–75 (2022) (*Ashe County III*). After careful review, we reverse the Court of Appeals and hold the superior court did not err in affirming the Ashe County Planning Board's decision to issue the PID

---

[1] We refer to the Court of Appeals' initial decision in this case, *Ashe County v. Ashe Cnty. Plan. Bd.*, 265 N.C. App. 384 (2019), as "*Ashe County I.*"

Ordinance permit.

## I.  FACTUAL BACKGROUND

### A. Appalachian Materials' PID Permit Application

In June 2015, Appalachian Materials submitted an application to the Ashe County Director of Planning (the Planning Director) for a permit to build an asphalt plant under Ashe County's PID Ordinance. The PID Ordinance, in Chapter 159 of the Ashe County Code, imposed the following permitting conditions:

> (A) A permit is required from the Planning Department for any polluting industry. A uniform permit fee of $500.00 shall be paid at the time of the application for the permit. No permit from the planning department shall be issued until the appropriate Federal and State permits have been issued.
>
> (B) The location of a polluting industry, both portable and permanent shall not be within 1,000 feet, in any direction, of a residential dwelling unit or commercial building. The location of a polluting industry shall not be within 1,320 feet of any school, daycare, hospital or nursing home facility.
>
> > (1) Permanent roads, used in excess of six months, within the property site shall be surfaced with a dust free material (i.e. soil cement, portland cement, bituminous concrete).
> >
> > (2) Material piles and other accumulations of by-products shall not exceed 35 feet above the original contour and shall be graded so the slope shall not exceed a 45-degree angle.
> >
> > (3) A security fence, constructed of either wood, brick, or aluminum, shall be installed where the proposed extraction takes place. The fence shall be

> a minimum of 10 feet in height at the time of installation.
>
> (4) The operation of this type industry shall not violate the Ashe County Noise Ordinance.

Ashe County, N.C., Code of Ordinances § 159.06 (2016) (repealed 2016).

Appalachian Materials' application spanned 158 pages and included aerial images with drawn boundaries for the proposed site, topographical maps with the same drawn boundaries, a marked floorplan showing the equipment and layout of the proposed plant, and a pending air quality permit application to the North Carolina Department of Environment and Natural Resources, Division of Air Quality (the State Permit).[2] The aerial photographs and topographical surveys further showed the location of the proposed asphalt plant site in relation to existing buildings on nearby tracts. State stormwater and mining permits already issued for the site were also included in the application.

Appalachian Materials represented in its application that the proposed asphalt plant complied with the PID Ordinance's setback, road paving, material accumulation, fencing, and noise requirements. It also promised to forward a copy of the State Permit to the Planning Director once it was issued. Finally, Appalachian Materials paid—and Ashe County accepted—the $500 PID Ordinance permitting fee.

---

[2] Before the State Permit was issued, the Department of Environment and Natural Resources was renamed to the Department of Environmental Quality (NCDEQ). As for any federal permits, Appalachian Materials represented that no federal approvals were required, and nothing in the record suggests otherwise.

## B. The Planning Director's Review and Denial

The Planning Director reviewed the application materials, visited the proposed plant site, and created his own photographs and maps from Ashe County's Geographic Information Services system (GIS). In initial communications with Appalachian Materials following receipt and review of the permit application, the Planning Director stated that a provisional permit could not issue, but that he "could write a favorable recommendation, or letter stating that standards of our [PID Ordinance] have been met for this site, with the one exception [for lack of the State Permit]." He also gave an interview to a local news outlet, expressing that he "couldn't think of any limitations that would prevent construction of the plant." *Ashpalt plant planned for Ashe County*, Ashe Post & Times, June 19, 2015, https://www.ashepostandtimes.com/news/asphalt-plant-planned-for-ashe-county/article_75cc4464-16c7-11e5-a2ff-c7601060f7ea.html.

On 22 June 2015, and consistent with his earlier communications, the Planning Director sent Appalachian Materials a letter stating, "The proposed site does meet[ ] the requirements of the [PID Ordinance]. However, the county ordinance does require that all state and federal permits be in hand prior to a local permit being issued. . . . Once we have received the [State Permit] our local permit can be issued for this site."

Public opposition to the asphalt plant grew in the ensuing weeks and, on 28 August 2015, the Ashe County Planning Department issued a staff report to the Ashe

County Planning Board (the Board) deeming Appalachian Materials' application incomplete. It noted that "[i]ssues have been raised as to whether or not the proposed plans adequately protect the health, safety and welfare of the neighboring property owners," and offered the possibility of a temporary moratorium to further study the question. Ashe County (the County) adopted just such a moratorium on 19 October 2015, which ran until October 2016. Ashe County, N.C., Ordinance Establishing a Development Moratorium on Polluting Industries (Oct. 19, 2015) [hereinafter the Moratorium].

Appalachian Materials received the State Permit while the Moratorium was still in effect and forwarded it to the Planning Director on 29 February 2016. When the Planning Director did not rule on its application, Appalachian Materials threatened suit against the County on 21 March 2016. The Planning Director[3] subsequently denied Appalachian Materials' application by letter dated 20 April 2016 on the following bases: (1) the plant was within 1,000 feet of commercial and residential buildings, a fact the Planning Director believed Appalachian Materials had materially misrepresented in its application; (2) the application was incomplete on submission because the State Permit was pending at that time and grading had been performed without requesting or receiving a watershed permit; (3) the application contained several statements concerning the setback requirements, air

---

[3] This was the same Planning Director who had previously visited the site, prepared photographs and maps, and issued the June 2015 letter stating that the application "me[t] the requirements of the [PID] Ordinance."

quality permitting timeline, undisclosed grading, and amount of asphalt to be produced that the Planning Director deemed false, misleading, or misrepresentative; and (4) the June 2015 letter was not a decision of any kind. Appalachian Materials timely appealed the Planning Director's decision to the Board.[4]

**C. The Board Reverses**

The Moratorium expired and, on 3 October 2016, the County repealed the PID Ordinance and replaced it with a more stringent High Impact Land Use Ordinance. *Id.* The Board initially heard Appalachian Materials' appeal on 6 October 2016, receiving over 1,000 pages of exhibits and roughly six hours of witness testimony before adjourning without a decision. The Board met again on 20 October 2016 to resume deliberations, whereupon it voted to reverse the Planning Director's denial pending preparation and review of a final order. Then, following public comment at a 1 December 2016 meeting, the Board entered a lengthy formal order reversing the Planning Director's denial of the permit. *Id.* In that order, the Board found that: (1) the watershed permit, as a local permit, was not a prerequisite to issuance of a PID permit; (2) the grading deemed problematic by the Planning Director was not done by Appalachian Materials and did not require an additional local watershed permit;

---

[4] A local government's governing board may create planning boards and boards of adjustment. N.C.G.S. §§ 153A-321, 153A-345.1, 160A-388 (2019) (repealed 2021); *see also* N.C.G.S. §§ 160D-301(a), 160D-302(a) (2023). The local governing board may also elect to "designate a planning board . . . to perform any of the duties of a board of adjustment." N.C.G.S. § 160A-388(a); *see also* N.C.G.S. § 160D-302(b) (2023). Vacancies on such a board are filled by appointment of the governing body—in this case, the Ashe County Board of Commissioners. N.C.G.S. §§ 153A-345.1, 160A-388(a); *see also* N.C.G.S. § 160D-310 (2023).

(3) the asphalt plant would not be within 1,000 feet of any residential building, as the Planning Director based his contrary determination on a scrivener's error committed by NCDEQ in issuance of the State Permit; (4) the purported commercial buildings—a mobile shed owned by Appalachian Materials' parent company on an adjoining quarry and a barn—were shown on the aerial photographs submitted by Appalachian Materials; (5) the mobile shed and barn did not trigger the commercial setback requirements because the former was not a "building" and the latter was not used in connection with any business; and (6) NCDEQ's engineer prompted the increase in anticipated asphalt production seen in the State Permit and, in any event, the tonnage produced is irrelevant to issuance of a permit under the PID Ordinance.

Based on these findings, the Board concluded that: (1) the permit was "sufficiently complete to trigger the Permit Choice Statutes"; (2) the mobile shed and barn were not commercial buildings; (3) Appalachian Materials' application satisfied the PID Ordinance requirements; and (4) there were "no intended or material misrepresentations" in the application and any variances were irrelevant to the PID Ordinance's requirements. It also reversed the Planning Director on an alternative conclusion that the June 2015 letter was a binding final determination to issue the PID permit.

**D. The County's First Appeal**

The County appealed by certiorari to the superior court pursuant to N.C.G.S. § 160A-393 (2019) (repealed 2021). Under the statutorily prescribed standards of

review, the superior court held that: (1) the Board's findings of fact were supported by competent evidence under the whole record test, as conceded by the County; and (2) the Board's conclusions of law were free from legal error on *de novo* review. The County again appealed and the Court of Appeals affirmed. *Ashe County I*, 265 N.C. App. at 394. That court held that: (1) the application was sufficiently complete to trigger the Permit Choice statutes; (2) the Moratorium had no impact on those statutory rights; (3) the June 2015 letter from the Planning Director was binding on the County as to the 1,000 ft. commercial building buffer; and (4) the Board was free to overrule the Planning Director's determination that the application contained misrepresentations. *Id.* at 388–394.

This Court subsequently considered the Court of Appeals' ruling on discretionary review. *Ashe County II*, 376 N.C. at 11. Our decision was limited: we reversed the Court of Appeals' determination that the June 2015 letter was binding in any respect and remanded for reconsideration of the remaining issues in light of our holding. *Id.* at 20–21.[5]

**E. The Instant Appeal**

On remand, a majority of the Court of Appeals reversed the Board. *Ashe County III*, 284 N.C. App. at 575. The majority first held that the Permit Choice

---

[5] Our remand acknowledged these four issues, instructing the Court of Appeals to address: (1) the completeness of the application to trigger permit choice; (2) the authority of the Planning Director to deny the application under the Moratorium; (3) the 1,000 foot commercial setback requirement; and (4) the existence of any material misrepresentations. *Ashe County II*, 376 N.C. at 20.

statutes did not apply because Appalachian Materials' application "was not 'submitted' within the meaning of the permit choice statutes until it was complete— on 29 February 2016, when counsel for Appalachian Materials . . . forwarded the [State Permit]." *Id.* at 571. It next held that no statutory exceptions to the Moratorium applied because Appalachian Materials' application had not been approved, permitted, or completed prior to the Moratorium's enactment; as a result, the Planning Director was barred from issuing the permit at the time he made his decision. *Id.* at 571–73. Lastly, the court held that "the record supports the Planning Director's conclusions regarding the location of these commercial buildings, and that the buildings did, in fact, qualify as commercial buildings within the meaning of the PID Ordinance in February 2016." *Id.* at 573. The majority declined to address whether Appalachian Materials made any misrepresentations in its application in light of these holdings. *Id.* at 574.

The dissenting judge disagreed with the majority's reversal of the Board's decision. *Id.* at 575 (Dillon, J., dissenting). On the question of permit choice, he would have held that Appalachian Materials' application was "submitted" within the meaning of the Permit Choice statutes because: (1) the term is undefined in the relevant statutes; (2) the General Assembly imposed an express completeness requirement under the moratoria statute but *not* the Permit Choice statutes; and (3) the majority's construction of the term is at odds with the legislature's desire to provide certainty to developers. *Id.* at 579–80. As for Appalachian Materials'

compliance with the PID ordinance's commercial setback requirements, the dissenting judge would have affirmed the Board's conclusions that the shed and barn were not "commercial buildings" under the canons of construction applicable to land use ordinances. *Id.* at 580–81. He likewise would have affirmed the Board's determination that there were no material misrepresentations in Appalachian Materials' application. *Id.* at 582.

Appalachian Materials now appeals the Court of Appeals' decision on the basis of the dissent. The County conditionally appeals—also on the basis of the dissent— the question of whether the Board properly determined Appalachian Materials' application was free from material misrepresentations.[6]

---

[6] The County has filed a motion to dismiss Appalachian Materials' appeal, and Appalachian Materials has filed a petition for writ of certiorari should that motion be granted. In seeking dismissal, the County first argues that the majority resolved issues 1– 3, detailed *supra* note 5, against Appalachian Materials on remand and without reaching issue 4. However, the County argues, the dissent only explicitly addressed issues 1, 3, and 4, and did not mention issue 2—the authority of the Planning Director to deny the permit application under the Moratorium. The County asserts that issue 2 was dispositively decided by the majority, and its absence from the dissent precludes reversal. As to the remaining issues, the County asserts that the notice of appeal is jurisdictionally defective because Appalachian Materials' notice of appeal does not state issues 1–4 "strictly . . . [and] without variation or departure from the Supreme Court of North Carolina's remand and mandate [in *Ashe County II*]."

We disagree with each argument by the County. The Court of Appeals' majority addressed issue 2 but did not dispositively resolve issue 2 against Appalachian Materials such that denial of its application was mandated. The majority did not address whether the Moratorium affirmatively authorized or compelled *denial*; instead, it merely held that "under the [M]oratorium, . . . the Planning Director lacked the authority to *approve* the application." *Ashe County III*, 284 N.C. App. at 573 (emphasis added). Moreover, the dissent would have held that Permit Choice applied and the pre-Moratorium PID Ordinance authorized issuance of the permit, *id.* at 575 (Dillon, J., dissenting), and "agree[d] with the Planning Board's resolution on the issues of law which [were] before [the Court of Appeals]," *id.* at 582. Thus,

## II.   ANALYSIS

This appeal turns on three core questions, namely whether: (1) Appalachian Materials submitted a "complete" application in June 2015 such that Permit Choice applied as of that date; (2) the Board properly determined that the mobile shed and barn are not commercial buildings for purposes of the PID Ordinance's setback requirements; and (3) the Board properly determined that Appalachian Materials made no material misrepresentations in its application.[7]  We address each in turn.

### A. Standard of Review

On an appeal from a superior court's ruling on a planning board decision, "[w]e review the trial court's order for errors of law.  Our review asks two questions: Did the trial court identify the appropriate standard of review, and, if so, did it properly apply that standard?"  *Morris Commc'ns Corp. v. City of Bessemer City Zoning Bd. of Adjustment*, 365 N.C. 152, 155 (2011) (citations omitted).  What constitutes the "appropriate standard of review" to be employed by the reviewing court is dependent

---

the dissent necessarily rejected any notion that the Moratorium required denial.  Finally, as to the other issues identified by this Court's remand in *Ashe County II*, we read the language of Appalachian Materials' notice of appeal to encompass the issues consistent with their framing by the dissent.  Our jurisdiction in this case stems from the reasoning of the dissenting judge as it relates to the issues before the Court of Appeals, *Cryan v. National Council of YMCAs of the United States*, 384 N.C. 569, 570 (2023), and we see no jurisdictional defect in either the dissent or the notice of appeal based thereon.  We deny the County's motion to dismiss, dismiss Appalachian Materials' petition for writ of certiorari as moot, and resolve all issues raised and briefed by the parties.

[7] Appalachian Materials raises a fourth argument that it had a vested right to permit choice.  That argument is waived for failure to raise it before the Board.  *See Godfrey v. Zoning Bd. of Adjustment*, 317 N.C. 51, 63–64 (1986) (noting it is not "appropriate . . . to affirm the decision of the Zoning Board of Adjustment by substituting for its basis a legal theory not relied upon by the Board").

on the issues raised by the appellant. *Id.* Challenges to legal conclusions—such as the interpretation of an ordinance or statute—are reviewed *de novo*. *Id.*; *see also* N.C.G.S. § 160D-1402(j)(2) (2023) (identifying the legal errors subject to *de novo* review). Challenges to factual findings, however, are subject to the "whole record test." *Mann Media, Inc. v. Randolph Cnty. Plan. Bd.*, 356 N.C. 1, 13 (2002); s*ee also* N.C.G.S. § 160D-1402(j)(1)e (2023). (noting that an appeal asserting findings are "[u]nsupported by competent, material, and substantial evidence" subjects the order to examination "in view of the entire record").

The *de novo* and whole record standards "are distinct." *Mann Media*, 356 N.C. at 13. In the present case, the interpretation of the PID Ordinance, Permit Choice statutes, and moratoria statutes are all questions of law subject to *de novo* review. *Morris Commc'ns Corp.*, 365 N.C. at 155. We therefore "consider[ ] the case anew and may freely substitute [our] own interpretation of an ordinance for [the Board's] conclusions of law," *id.* at 156, and the same holds true for the interpretation and application of the relevant Permit Choice and moratoria statutes, *In re Foreclosure of a Lien by Exec. Office Park of Durham Ass'n Against Rock*, 382 N.C. 360, 362 (2022).

Of note and particular import to this case, the above standards apply to judicial appeals *from* planning boards; they do not apply to administrative appeals from planning directors' determinations *to* those boards. Planning boards instead "may reverse or affirm, wholly or partly, or may modify the decision appealed from and shall make any order, requirement, decision, or determination that ought to be made.

The board shall have all the powers of the official who made the decision." N.C.G.S. § 160D-406(j) (2023); *see also* Ashe County, N.C., Code of Ordinances § 153.04(J)(3)(f) (2016) (giving the Board the authority to "uph[o]ld, modif[y], or overrule[ ] in part or in its entirety" the Planning Director's decision).

## B. Appalachian Materials' June 2015 Application Was "Complete"

The parties first disagree over the correctness of the Board's and Court of Appeals' differing determinations as to whether the June 2015 application was "complete" for purposes of the Permit Choice statues. Appalachian Materials argues that the Board's determination was proper, contending: (1) Permit Choice triggers when the applicant pays any required fee and submits an application sufficiently complete to allow the reviewing body to begin evaluation of the permit; and (2) Appalachian Materials "submitted," *i.e.*, tendered the fee and a sufficiently complete application, in June 2015 even though it did not have the State Permit in hand. Appalachian Materials reasons this is so because the application allowed the Planning Director to determine compliance with the *County's* PID Ordinance requirements even without the *State* Permit.

The County disagrees, arguing that: (1) the timeframe for triggering Permit Choice was shortened due to the enactment of the Moratorium; and (2) an application is "complete" for purposes of Permit Choice under the moratoria statute when it is submitted truthfully, in good faith, and with a site plan showing the locations of all buildings and improvements contemplated by the developer. Reviewing the Permit

Choice, moratoria, and other related statutes setting forth the powers and authority of local government over land use planning, we hold that the Board did not err in determining Appalachian Materials' application was complete for purposes of permit choice and in light of the text of the PID Ordinance upon its initial submission in June 2015, and the superior court likewise did not err in affirming that decision.

### 1. *Permit Choice, Moratoria, and Completeness*

Weighing developers' interests in a predictable regulatory environment and the desire of the public to update and amend land restrictions to foster or foreclose certain uses, N.C.G.S. § 160D-108(a), our General Assembly has enacted a Permit Choice statute that provides, "If a permit applicant *submits* a permit application for any type of development and a rule or ordinance is amended . . . between the time the development permit application *was submitted* and a development permit decision is made, the development permit applicant may choose which adopted version of the rule or ordinance will apply to the permit." N.C.G.S. § 143-755(a) (emphasis added); *see also* N.C.G.S. § 160D-108(b) ("If a land development regulation is amended between the time a development permit application was submitted and a development permit decision is made . . . G.S. 143-755 applies."). No completeness requirement exists in the Permit Choice statutes.

There is, however, a completeness requirement that applies under the moratoria statute. It provides that "if a complete application for a development approval has been submitted prior to the effective date of a moratorium, [the Permit

Choice statute] [N.C.]G.S. [§] 160D-108(b) applies when permit processing resumes." N.C.G.S. § 160D-107(c) (2023). The term "complete" is not defined by the statutory text and, under its ordinary definition, is well understood to mean "having all necessary parts, elements, or steps." *Complete*, Merriam-Webster's Collegiate Dictionary (10th ed. 1999); s*ee also Perkins v. Arkansas Trucking Servs., Inc.*, 351 N.C. 634, 638 (2000) ("[C]ourts may look to dictionaries to determine the ordinary meaning of words within a statute."). But that definition raises an obvious question: "having all necessary parts" *for what purpose*? The Court of Appeals and the parties all have different answers, offering distinct interpretations as to how the word applies in this case when considered in context. *See, e.g., State v. Ludlum*, 303 N.C. 666, 671 (1981) ("Unless statutory words have acquired some technical meaning they are construed in accordance with their ordinary meaning unless some different meaning is definitely indicated by the context.").

Appalachian Materials contends "complete" should mean "having all necessary parts" to begin reviewing the application to determine substantive compliance with the relevant ordinances. The Court of Appeals majority effectively read "complete" to mean "having all necessary parts," *Complete*, Merriam-Webster's Collegiate Dictionary, to issue the permit, *Ashe III*, 284 N.C. App. at 572.[8] Finally, the County argues that an application is considered complete only if it facially satisfies,

---

[8] Though not explicit in its opinion, the Court of Appeals appears to have adopted this understanding, equating "completed . . . application[s]" to those that are approved and permitted. *Ashe County III*, 284 N.C. App. at 572.

truthfully and in good faith, all elements of the permitting ordinance by including a site plan or survey tying all uses, structures, *etc.*, to the land. We resolve the ambiguous usage of "complete" consistent with Appalachian Materials' interpretation for the reasons set forth below.

### 2. *Appalachian Materials' Reading Comports with Statutory Law and Established Local Government Permitting Practice*

Reference to the statutory scheme and the permit review authority given to planning boards sitting as boards of adjustment resolves this dispute. *See State v. James*, 371 N.C. 77, 85 (2018) ("[T]he words in which a statute is couched should be read in context and with a view to their place in the overall statutory scheme." (cleaned up)). Here, the Permit Choice statutes directly contemplate some back-and-forth between the permitting body and the applicant, as well as supplementation of the permit application. *See* N.C.G.S. § 143-755(b1) (providing that permit choice is forfeited if "the applicant fails to respond to comments or provide additional information reasonably requested by the . . . government for a period of six consecutive months or more").[9] This comports with the ordinary practicalities of local government development permitting. *See Northwestern Fin. Grp., Inc. v. County of*

---

[9] The County argues that this provision should bar Appalachian Materials' right to Permit Choice, as it did not forward the State Permit within six months of applying for the PID Ordinance. But nothing in the record shows that Appalachian Materials was dilatory in responding to any requests for information from the Planning Director, let alone that it delayed providing any requested information in its possession for six months or more.

*Gaston*, 329 N.C. 180, 189 (1991) ("The revised plans were essentially a part of the normal give and take between the applicant and the regulatory authorities.").

The moratoria statute, meanwhile, also suggests that a "complete application" is one that is submitted and *accepted by the local government as such* rather than full and final for permit issuance purposes. *See* N.C.G.S. § 160D-107(c) (providing that moratoria do not apply "to any project for which a special use permit application has been *accepted* as complete" (emphasis added)). This is consistent with how development permit application "completeness" is understood in the Permit Choice context. *See, e.g.,* Adam Lovelady, *Permit Choice Rule for Development Regulations*, UNC School of Government: Coates' Canons NC Local Government Law (Dec. 6, 2021), https://canons.sog.unc.edu/2021/12/permit-choice-rule-for-development-regulations/ (noting that "[i]n the normal course of permitting review, there is some natural back-and-forth," and "ensur[ing] that an application is sufficiently *complete to initiate the permit review process*" aids in "set[ting] a clear starting point for the permit choice rule" (emphasis added)).

Indeed, the General Assembly has vested local planning departments—and, by extension, reviewing planning boards acting as boards of adjustment on *de novo* review, N.C.G.S. § 160D-406(j)—with authority to make completeness determinations separate from the question of permit issuance. *See* N.C.G.S. § 160D-402(b) (2023) ("Duties assigned to [local government planning] staff may include . . . determining whether applications for development approvals are

-18-

complete; receiving and processing applications for development approvals; . . . [and] determining whether applications for development approvals meet applicable standards as established by law and local ordinance . . . .").[10]  Staff are empowered "to develop, administer, and enforce development regulations authorized by this Chapter," *id.* § 160D-402(a) (2021), including those concerning completeness determinations, *id.* § 160D-402(b).  The General Assembly's intention to leave completeness determinations up to the local government is also evident in the moratoria statute.  *See id.* § 160D-107(c) (providing that moratoria do not apply "to any project for which a special use permit application has been *accepted* as complete" (emphasis added)).  And the reviewing planning board sitting as a board of adjustment is given full authority to revisit any planning staff completeness determination at a *de novo* hearing.  *Id.* § 160D-406(j) ("The board shall have all the powers of the official who made the decision.").

In short, N.C.G.S. § 160D-402(b) authorizes local planning departments to make completeness determinations for the purposes of their local ordinances, and N.C.G.S. § 160D-406(j) allows reviewing planning boards sitting as boards of

---

[10] Though vested with authority to make their own completeness determinations, local governments cannot, of course, make determinations that are arbitrary, capricious, or otherwise prohibited by law.  No such challenge is lodged here.  They likewise must interpret and apply their ordinances in accordance with the law, which we address *infra* on *de novo* review.  *See Arter v. Orange County*, 386 N.C. 352, 357 (2024) (noting that while "it is exclusively the judiciary's role 'to say what the law is[,]' . . . legislative bodies are free to define terms, provide grammatical rules, and take other steps to eliminate potential ambiguity in the text of written laws" (citations omitted)).

adjustment to revisit those completeness determinations *de novo.* This also accords with the General Assembly's intent "to foster cooperation between the public and private sectors in land-use planning and development regulation," *id.* § 160D-108(a), as it recognizes that the local government is best positioned to identify whether the application is acceptable for review as a complete application notwithstanding any future revisions or addenda that may be requested and required prior to issuance of the permit. *See id.* § 160D-107(c) (exempting from moratoria "any project for which a special use permit application has been accepted as complete"); *id.* § 143-755(b1) (noting that permit choice is abandoned if "the applicant fails to respond to comments or provide additional information reasonably requested by the local or State government for a period of six consecutive months or more"); *cf. Northwestern Fin. Grp.,* 329 N.C. at 189 ("The revised plans were essentially a part of the normal give and take between the applicant and the regulatory authorities.").

Consistent with the above statutes and the practicalities of local land-use permitting, caselaw reveals that some local jurisdictions have enacted ordinances that bear upon application completeness determinations. Some provide that applications are evaluated on a case-by-case basis and need not always address every requirement of a governing ordinance to be complete. *See, e.g., Richardson v. Union Cnty. Bd. of Adjustment*, 136 N.C. App. 134, 141 (1999) (deferring to a reviewing board's determination that an application was complete despite absence of certain details in the application in part because a local ordinance provided that "each

development is unique, and therefore the permit issuing authority may allow less information or require more information to be submitted according to the needs of the particular case"). Others state that an application must address all of the ordinance's requirements to be reviewed while also making explicit the necessary contents of an application—including the necessity of a site plan. *See Wade v. Town of Ayden*, 125 N.C. App. 650, 652 (1997) (reviewing an ordinance that provided applications "shall include all of the requirements pertaining to it . . . and without such information cannot be processed for consideration by the Planning Board and Board of Commissioners" and provided that "applications shall include site plans and shall be prepared to provide a full and accurate description of the proposed use").[11]

With an eye to the overall statutory scheme governing local government permitting, Permit Choice, and moratoria—and keeping in mind that the affordance of Permit Choice rights renders that statute remedial and subject to broad construction, *see Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 545 (2018) (recognizing this general principle of statutory interpretation)—we hold that a "complete application" is not equivalent to a full and final application, but instead

---

[11] No such ordinances appear of record here, and the statutory grant of authority to *local governments*, unlimited in this case by any public regulation outlining how and when completeness determinations are made by Ashe County, substantially undercuts the County's position that an application is complete if "*the applicant* ha[s] a reasonable expectation of receiving a permit under law when the application was submitted." (Emphasis added). In other words, whether an application is "complete" turns on the local governing body's ability to assess the application, not the reasonableness of the applicant's expectations.

refers to one that is accepted by the permitting authority as adequate to begin permit compliance review.

### 3. *The Court of Appeals' and the County's Interpretations of "Complete" Are Contrary to Law*

The other explanations put forth by the Court of Appeals and the County do not dissuade us from this conclusion. The Court of Appeals' interpretation equating "complete" with "final for permitting purposes" is untenable for several reasons. For one, reading the moratoria statute in this manner would impermissibly render redundant portions of N.C.G.S. § 143-755(b1) which extinguish permit choice for failure to reasonably supplement an application within six months. *See, e.g., State v. Conley*, 374 N.C. 209, 215 (2020) ("It is a well-established rule of statutory construction that a statute must be considered as a whole and construed, if possible, so that none of its provisions shall not be rendered useless or redundant. It is presumed that the legislature did not intend any provision to be mere surplusage." (cleaned up)). Stated simply, if permit choice applies only to applications that are substantively finalized and are simply awaiting issuance, there would be no need for the legislature to establish a six-month permit choice preservation window expressly allowing for the provision of supplemental information. Such a reading would also allow local governments to negate permit choice in the many instances where such back-and-forth is required; a local government could simply enact a moratorium during this period of application revision, repeal and/or replace the ordinance, and

deny the permit outright under the theory that the application was not "complete" at the time of the moratorium's enactment.

While there are times when some local advocates may prefer that new development proposals be denied for a multitude of different laudable reasons, this Court's ability to address such advocates' goals is limited both by fact-finding performed by local quasi-judicial bodies and by the policies established by the legislature absent some properly-lodged constitutional or statutory objection to those legislative policies. We cannot construe or apply statutory language to "eviscerate [a] statute's function," *In re Summons Issued to Ernst & Young, LLP*, 363 N.C. 612, 618 (2009), particularly when it runs contrary to the General Assembly's express intent in enacting Permit Choice to "ensure reasonable certainty, stability, and fairness in the development regulation process, to secure the reasonable expectations of landowners, and to foster cooperation between the public and private sectors in land-use and development regulation," N.C.G.S. § 160D-108(a). Finally, as a remedial statute, the Permit Choice and moratoria statutes should be read broadly to afford the relief offered by the statute rather than to defeat colorable claims thereunder. *Wilkie*, 370 N.C. at 545.

The County's position—requiring, in all instances, that a complete application include "a site plan, spreadsheet or report" that specifies all the intended uses and ties them to the land—is equally untenable. That reading is itself at odds with the County's positions taken elsewhere in its briefing; for example, the County

acknowledges that Permit Choice is intended to apply to a wide swath of development permitting, yet there is no factual or legal basis to assume that all such permitting ordinances require site plans, spreadsheets, or reports as permitting or application preconditions. *Compare Richardson*, 136 N.C. App. at 141 (reviewing an ordinance that allowed staff to accept more or less information than that required by the text of the permitting ordinance in making completeness determinations), *with Wade*, 125 N.C. App. at 652 (reviewing an ordinance that specifically required all applications include a site plan). Moreover, the County acknowledges that "Permit Choice does not change *the regulatory requirements . . . of the rule or ordinance chosen*," and yet the County reads the Permit Choice statutes to insert a detailed site plan requirement into all permitting ordinances, whether expressly included or not.[12] Put simply, the Permit Choice statutes do not import requirements of detailed site plans, spreadsheets, reports, and the like into regulations—like the PID Ordinance—where none exist.

The County also argues that Appalachian Materials' reading would create "differing rules across local governments" concerning when Permit Choice triggers.

---

[12] The County relies on the statute's language providing that "the development permit applicant may choose which adopted version of the rule or ordinance *will apply to the permit and use of the building, structure, or land indicated in the permit application*," N.C.G.S. § 143-755 (emphasis added), for the proposition that detailed site plans, spreadsheets, or reports are required in all instances. This overreads the plain text of the statute—for example, it is entirely possible to identify "land" by written description without a site plan, spreadsheet, or report, as evinced by the countless real estate deeds recorded in North Carolina that do so.

It is difficult to see how the General Assembly could have intended anything else; local governments are empowered to enact their own permitting ordinances, so whether an application has been "completed" or "submitted" will *always* vary from locality to locality—and even from ordinance to ordinance. Moreover, and as explained above, the General Assembly expressly contemplated local governments enacting their own application procedures and making their own completeness determinations thereunder. N.C.G.S. §§ 160D-402(a)–(b), 160D-107(c). Indeed, some jurisdictions have done so by adopting ordinances of varying firmness and flexibility. *Compare Richardson*, 136 N.C. App. at 141 (reviewing an ordinance that allowed staff to accept more or less information than that required by the permitting ordinance in making completeness determinations), *with Wade*, 125 N.C. App. at 652 (reviewing an ordinance that required an application address all requirements of the permitting ordinance in order to be considered by the permitting authority and setting forth explicit elements that an application must contain).

Finally, the County argues that Appalachian Materials' application could not have been complete because it was: (1) false; (2) illegal due to the unpermitted grading; and (3) offered in bad faith. None of these formed the basis for the Court of Appeals' determination of incompleteness; to the contrary, the Court of Appeals held that the application *was* completed—albeit too late—on issuance of the State Permit. Nor are these conditions imposed in the PID Ordinance or the Permit Choice or moratoria statutes. We further disagree with these arguments as detailed below.

### 4. *The Application Was Complete for Purposes of the PID Ordinance*

Even setting aside the Board's statutory authority to determine permit application completeness, *de novo* interpretation and application of the PID Ordinance demonstrates Appalachian Materials' application was complete in June 2015 even without the State Permit. "[G]overnmental restrictions on the use of land are construed strictly in favor of the free use of real property." *Morris Commc'ns Corp.*, 365 N.C. at 157. Strictly construing the PID Ordinance, the only immediately obvious requirement imposed on the application itself is payment of the $500 fee. Ashe County, N.C., Code of Ordinances § 159.06(A). And it is evident that not all the provisions of the PID Ordinance apply at the application stage; subsection (B)(4) provides that "[t]he operation of this type industry shall not violate the Ashe County Noise Ordinance," a requirement that, by its very nature, cannot be satisfied prior to permit issuance. *Id.* § 159.06(B)(4). Similarly, the ordinance's requirements concerning paved roads and material piles likewise contemplate post-permitting conduct. *Id.* § 159.06(B)(1)–(2).

Other requirements do, however, appear applicable to the application itself. The definitional portion of the PID Ordinance provides that "distance requirements shall be measured from the *proposed* building to the existing dwelling or other structure." *Id.* § 159.05 (emphasis added) (repealed 2016). And subsection (B) of the PID Ordinance establishes a 1,000 foot setback from residential and commercial buildings and a 1,320 foot setback from schools, daycares, hospitals, and nursing

home facilities. *Id.* § 159.06(B). Relatedly, subsection (B)(3) provides that "[a] security fence . . . shall be installed where the *proposed* extraction takes place," again indicating that the application must at least propose what extraction, if any, will occur under the permit. *Id.* § 159.06(B)(3).

As for the state and federal permitting requirement, this does not appear to apply at the permit application stage under a strict construction of the ordinance; the PID Ordinance simply states that "[n]o permit from the planning department shall be issued until the appropriate Federal and State permits have been issued." *Id.* § 159.06(A). This, strictly construed, is a limitation on the ability of the County to issue a permit rather than a definition of what constitutes a completed application. As such, a completed application can be submitted under the ordinance without state or federal permits, but no PID Ordinance permit will issue until those permits, if required by some other authority, are supplied.

Appalachian Materials' application met these pre-permitting requirements. It included the $500 fee, provided a survey of the proposed site to allow review of the setback requirements, and disclaimed any proposed extraction. It further indicated that the State Permit was pending and that no federal permits were needed. Finally, it assured future compliance with the post-permitting, forward-looking provisions of the PID Ordinance. Indeed, it was sufficiently complete to allow the Planning Director to "visit[ ] the Property, create[ ] and review[ ] certain GIS Maps and photographs that identified all buildings in close proximity to the Property and

create[ ] certain GIS shape files identifying any buildings that required buffering or setbacks . . . under the Ordinance," before determining in June 2015 that the "plans do meet the requirements of ou[r] ordinance." We hold the Board appropriately found and concluded, supported by competent evidence and the above interpretation of the relevant statutes and caselaw, that the June 2015 application was complete when submitted. The superior court did not err in affirming this decision.

**C. Appalachian Materials' Application Complied with the PID Ordinance Setback Requirements**

Having held that the June 2015 PID Ordinance application was "complete" for purposes of Permit Choice under the moratoria statute, we now turn to whether the application satisfied that ordinance's requirements. The Court of Appeals held that it did not meet the commercial setback requirement based on the proposed plant's proximity to a mobile shed on an adjoining quarry and a barn on a nearby farm, reasoning that "the record supports the Planning Director's conclusions regarding the location of the commercial buildings, and that the [mobile shed and barn] did, in fact, qualify as commercial buildings within the meaning of the PID Ordinance in February 2016." *Ashe III*, 284 N.C. App. at 573. Our *de novo* consideration of whether the shed or barn constituted "commercial buildings" leads us to reverse the Court of Appeals and affirm the superior court's and Board's orders.

The PID Ordinance does not define the phrase "commercial buildings." We therefore give those words their ordinary meanings. *In re Clayton-Marcus Co.*, 286 N.C. 215, 219 (1974). Some ordinary definitions of the word "building" denote

permanence. *See, e.g.*, *Building*, Black's Law Dictionary (10th ed. 2014) ("A structure with walls and a roof, *esp. a permanent structure.*" (emphasis added)); *Building*, Webster's New World Dictionary (3d Coll. ed., 1988) ("[A]nything that is built with walls and a roof . . . [,] the general term applied to a *fixed* structure in which people dwell, work, etc." (emphasis added)); *Building*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/building (last visited Mar. 8, 2025) ("[A] usually roofed and walled structure built for *permanent* use." (emphasis added)). The Court of Appeals, for its part, has previously held that the ordinary definition of "building" does indicate permanence. *Kroger Ltd. P'ship I v. Guastello*, 177 N.C. App. 386, 390–91 (2006*); see also Nash-Rocky Mount Bd. of Educ. v. Rocky Mount Bd. of Adjustment*, 169 N.C. App. 587, 590–91 (2005) (citing dictionary definitions denoting permanence and holding a parking lot was not within the undefined term "building" in a zoning ordinance in part because "it has no . . . kind of permanent, immovable features apart from a fence"). *But see Davidson County v. City of High Point*, 85 N.C. App. 26, 38 (adopting an ordinary definition of "building" that did not indicate permanence), *modified and aff'd*, 321 N.C. 252, 256 (1987) (declining to affirm based on the Court of Appeals' definition of "building," and doing so instead "for a different and narrower reason"). Other definitions, however, do not suggest "a building" is fixed to the land. *See, e.g.*, *Building*, The American Heritage Dictionary (3d ed. 1992) ("Something that is built as for human habitation.").

To the extent that there is any ambiguity that arises from these conflicting

definitions, it is to be resolved in favor of Appalachian Materials: "This Court has long held that governmental restrictions on the use of land are construed strictly in favor of the free use of real property." *Morris Commc'ns Corp.*, 365 N.C. at 157. The Court of Appeals' relatively recent decisions in *Kroger* and *Nash-Rocky Mount Bd. of Educ.* ascribing permanence to the ordinary meaning of the word "building" in land use restrictions further support that reading. The purpose of the PID Ordinance to protect "*established . . .* commercial areas in Ashe County," Ashe County, N.C., Code of Ordinances § 159.02 (2016) (emphasis added) (repealed 2016), likewise suggests that temporary commercial structures—like a mobile shed that is movable via forklift—are not intended to be protected by the regulation. Nor does the PID Ordinance, considered in context, suggest it is intended to protect a polluting industry from itself.[13]

The facts as found by the Board support the conclusion that the mobile shed on the adjacent quarry is not a "commercial building" by virtue of its impermanence. The Board found that "[t]he mobile shed . . . lacks a foundation, has no footers, and does not having running water," it was previously "relocated with minimal effort and equipment," and the property owner would and could have moved it if asked by the Planning Director. Construing the undefined term "building" in favor of the free use

---

[13] Rock quarries, asphalt plants, and rock crushing operations were the only polluting industries jointly and specifically identified as polluting industries by the County in the Moratorium enacted to study revisions to the PID Ordinance. Thus, Appalachian Materials' proposed asphalt plant and the neighboring quarry housing the shed at issue would both appear to be polluting industries.

of land and in keeping with the purposes of the PID Ordinance, the shed was not a "commercial building" as that term is used in the PID Ordinance's set-back requirements.

We reach the same ultimate conclusion as to the barn, but for different reasons. A barn is unquestionably a "building," and our analysis thus turns on whether it can be considered "commercial." That word is generally defined as "[o]f, relating to, or involving the buying and selling of goods." *Commercial*, Black's Law Dictionary (10th ed. 2014). In determining whether property is better described as commercial or residential in land use restrictions that leave those terms undefined, we have generally looked to the purposeful use of the building. For example, in *J.T. Hobby & Son, Inc. v. Family Homes of Wake Cnty., Inc.*, 302 N.C. 64 (1981), we held that a group home for persons with intellectual disabilities subject to a restrictive covenant limiting the property to "residential purposes" was not a prohibited commercial venture, *à la* a boarding house, simply because the group home received payments for its services from residents. *Id.* at 72. We explained:

> That defendant is compensated for the services it renders does not render its activities at the home commercial in nature. While it is obvious that the home would not exist if it were not for monetary support being provided from some source, that support clearly is not the objective behind the operation of this facility. That defendant is paid for its efforts does not detract from the essential character of its program . . . . Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of defendant's efforts. In no way can it be argued that a significant motivation

behind the opening of the group home by defendant was its
expectation of monetary benefits.

*Id.* at 73.

Our resort to the property's "essential purpose," *id.* at 72, makes logical sense; an old tobacco barn previously used to store tobacco may lose its agricultural character and adopt a commercial one when it is renovated and exclusively rented out as a wedding venue and event space. Conversely, the mere fact that some commercial activity takes place in a location does render it a "commercial building" as that phrase is ordinarily understood—a person who hosts Tupperware parties in their home has not converted it into a "commercial building."

The Board's findings support the conclusion that the barn at issue here was not a "commercial building." It found that "[t]he barn is not used to conduct business, is not used in connection with any commercial activity, has no parking or other access for anyone other than the property owner, has no road access, and does not have electricity or air conditioning." It further found that "[t]he County's tax card does not list the barn as a commercial building and signs on the barn state 'Keep Out' and 'No Trespassing.'" These findings are sufficient to conclude that the barn is not a "commercial building" within the common usage of the phrase; while there was some evidence that the owner stored harvesting equipment and hay in the barn—and that the latter was sold to cover his property taxes—there were no findings to that effect. And even that evidence is insufficient to establish the barn is substantially,

predominantly, or exclusively used for commerce in light of the Board's other supported findings. *Cf. id.* at 72–73.

## D. The Board's Material Misrepresentation Determination

In its final argument, the County asserts that the Board erred in determining that Appalachian Materials' application did not contain material misrepresentations. Its contention proceeds along three lines: (1) the Court of Appeals applied the wrong standard in reviewing whether the Board properly concluded that there were no intended or material misrepresentations; (2) the Board erred in placing the burden of proving the existence of fraudulent intent on the County; and (3) the application did contain material misrepresentations requiring denial of the permit. None of these contentions have merit, particularly when planning boards sitting as boards of adjustment are statutorily authorized to freely substitute their own factual and legal determinations for those of planning directors. N.C.G.S. § 160D-406(j).

The County's first line of argument fails because the Court of Appeals expressly declined to address the question of whether the Board appropriately resolved the material misrepresentation issue and thus could not have applied the incorrect standard to that issue. *Ashe County III*, 284 N.C. App. at 574 ("[W]e do not reach the issue of whether the alleged material misrepresentations . . . constituted an independent basis for denying the PID Ordinance application . . . ."). The County's second argument—that it was improperly burdened with showing fraudulent intent—is likewise misplaced, as the Board concluded there were "no intended *or*

material misrepresentations in the Application and any inaccuracies were irrelevant and should not be a reason for denial of the permit." (Emphasis added.) Put another way, there is no suggestion in the record that the burden of proving fraudulent intent was improperly allocated. The whole record test obligates us—and the reviewing superior court—to afford the Board, in sifting through the substantial evidence it received on the issue, deference to its findings on factual questions of deceptive or fraudulent intent. *See, e.g., Johnson v. Beverly-Hanks & Assocs., Inc.*, 328 N.C. 202, 209 (1991) (observing that whether a defendant knowingly made false representations with intent to deceive is an issue of fact).

As to the third argument, both the County and Appalachian Materials agree that only *material* misrepresentations should doom a permit. And, as Appalachian Materials rightly notes, materiality is a question of fact. *See, e.g., Henderson v. Rochester Am. Ins. Co.*, 254 N.C. 329, 333 (1961) ("[C]ourts generally hold the question of materiality and prejudice is a question for the jury.").[14]

Notwithstanding our lack of authority to disregard the Board's unchallenged findings, the County's evidentiary assertions in support of alleged material

---

[14] The County argues that materiality is not a question of fact based on *In re Moore*, 301 N.C. 634 (1981). The County is incorrect; *Moore* simply held that a finding of materiality on the part of the Board of Law Examiners was too indefinite to permit appellate review of its order denying the applicant from sitting for the bar, as the order "did not indicate which statements it considered to be untruthful" and thus could not be tested against the evidence. *Id.* at 640–41. Here, the Board made unchallenged findings of fact that there were no material misrepresentations, and it detailed how those alleged misrepresentations were neither material nor misrepresentations at all.

misrepresentations also fall short. It first contends that the property had been illegally graded before the application was submitted and that no determination of the "original contour" could thus be made under the PID Ordinance. But nothing in the record supports that assertion of illegality, as the evidence shows the grading was done under existing permits and there are no citations or judgments from any jurisdiction in connection with the grading. It also does not appear that any difference in grading between that recorded on the aerial map or survey and the true physical grading on the property was in any way material because—assuming representations concerning grading were even required by the PID Ordinance—the Planning Director physically visited the site *after* receiving the application and *before* telling Appalachian Materials that it satisfied all county-level PID Ordinance permitting conditions. In short, the Planning Director's actions demonstrate that any pre-application grading that was performed did not impact the ability of the Planning Director to assess Appalachian Materials' compliance with the operative provisions of the PID Ordinance.

The County next claims that Appalachian Materials misrepresented its compliance with the required 1,000 ft. setback. As explained above, two of the buildings complained of—the shed and the barn—were not "commercial buildings" subject to the setback and were present in the material submitted in the application. A third setback violation asserted by the County is not a violation at all, but rather a scrivener's error on the part of NCDEQ in issuing the State Permit. A fourth

purported violation—that access to a public road would be within 1,000 feet of a residence—was not preserved, as it was not the Planning Director's basis for denial, addressed by the Board in its findings or conclusions, appealed to superior court, or argued to or addressed by the Court of Appeals. *See Godfrey*, 317 N.C. at 63 (noting that we should not reach factual and legal issues not resolved by the planning board and that "[f]act finding is not a function of our appellate courts"). Moreover, access roads are also not explicitly governed by the PID Ordinance, nor are they strictly required as part of an application under the Ordinance.

The final purported material misrepresentation involves a disparity between the upper limit of tons produced under the State Permit application and the final permit released by NCDEQ. But this was neither a misrepresentation nor material; the application disclosed Appalachian Materials' initial intended production, the increase was done at the encouragement of NCDEQ, and the amount produced is, in any event, left completely unregulated by the PID Ordinance.

In sum, the Board had full authority on *de novo* review to make its own factual determination as to any material misrepresentations in Appalachian Materials' permit application. Those findings went unchallenged below and are binding on appeal, and the record evidence cited by the County fails to establish any such material misrepresentations. We affirm the superior court's affirmance of the Board's determination that Appalachian Materials' application was free of material misrepresentations.

### III. CONCLUSION

We hold that the Court of Appeals erred in concluding that the State Permit was required to complete the PID Ordinance application and trigger the Permit Choice statutes. Construing the relevant Permit Choice and moratoria provisions *in pari materia,* considering the overall local government development permitting scheme, and consistent with the statutes' purposes and relevant canons of construction, Appalachian Materials' application was sufficiently "complete" to trigger Permit Choice at the time it submitted its application. We likewise hold that the Court of Appeals erred in concluding that the mobile shed and barn are "commercial buildings" for purposes of the PID Ordinance. Finally, we hold that the Board had full authority to substitute its judgment for that of the Planning Director on all factual and legal issues, including whether any material misrepresentations existed and/or precluded permit issuance. For these reasons, we reverse the Court of Appeals and direct the Board to issue the permit under the PID Ordinance.

REVERSED.

Justice BERGER did not participate in the consideration or decision of this case.